**Wonderlyn Lorraine Bell PINCKNEY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 06–803 C.

United States Court of Federal Claims.

July 28, 2009.

---

Wonderlyn Lorraine Bell Pinckney, Georgetown, SC, pro se.

Michael Francis Kiely, with whom were Thomas J. Marshall, Deputy General Counsel, Civil Practice Section, United States Postal Service, Washington, DC, and Michael F. Hertz, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION

HEWITT, Chief Judge.

### I. Procedural Background

This case is before the court following a trial on a claim by plaintiff, Wonderlyn Lorraine Bell Pinckney (Ms. Pinckney or plaintiff), for breach of contract against the government (government or United States or defendant). Trial was conducted in Charleston, South Carolina on Thursday, January 22, 2009 and Friday, January 23, 2009. Pinckney Trial Transcript (Tr.) *passim*. The court heard testimony from eight witnesses[1] and

---

1. For convenient reference, the names, in alphabetical order, and a description of the witnesses upon whose live testimony the court relies in this opinion follow:

Kendrick Antonio Bryant, Sr. is a fact witness for plaintiff. Mr. Bryant is a highway contractor with the United States Postal Service (USPS) in Pawleys Island, South Carolina. Pinckney Trial Transcript (Tr.) 226:8–10 (Mr. Bryant). He has worked with the USPS delivering mail for over eight years. *Id.* at 226:12–13. Mr. Bryant has two contracts with the USPS in Pawleys Island, one that he runs himself, and one that he subcontracts out. *Id.* at 226:10–12. Mr. Bryant took over the route held by Wonderlyn Lorraine Bell Pinckney (Ms. Pinckney or plaintiff) following her termination. *Id.* at 226:17–20.

Deborah Fox is a fact witness for defendant. Ms. Fox has been an employee of the USPS for twenty-seven years. Tr. 14:23–25 (Ms. Fox). Ms. Fox is presently a clerk at the Pawleys Island Post Office, *id.* at 14:17–18, and has held that position for six years, *id.* at 14:21–22. Prior to her employment in Pawleys Island, she was a clerk in Delphos, Ohio, a Postmaster for thirteen years in Ohio, and a clerk at the Myrtle Beach Post Office for two years. *Id.* at 15:14–18. Ms. Fox described her duties while at Pawleys Island as follows: "I actually did retail, worked the window, and distribution, and I also did fill-in

for the Postmaster on Saturdays before we had a supervisor. I would basically answer the phone or if anybody had any questions, I would take his place on Saturday afternoons." *Id.* at 15:4–10.

Douglas Fox is a fact witness for plaintiff. Mr. Fox is a maintenance employee at the Pawleys Island Post Office. Tr. 53:5–7 (Mr. Fox). Mr. Fox was hired by the USPS in Ohio in December of 1978. *Id.* at 53:24–54:2. While in Ohio, Mr. Fox served as a postmaster, a supervisor of customer service, and a letter carrier. *Id.* at 53:16–18. Mr. Fox then worked as a clerk at the Myrtle Beach Post Office from April of 2000 until November of 2002. *Id.* at 53:15, 53:23–24. Mr. Fox began working at the Pawleys Island Post Office in November of 2002. *Id.* at 53–22–23. In addition to his work in maintenance, *id.* at 53:7, Mr. Fox has also served as a clerk and delivered express mail while at the Pawleys Island Post Office, *id.* at 53:8–11.

Keith Lee Harris is a fact witness for defendant. Mr. Harris is the Manager of Transportation Contracts for the Eastern Area of the USPS, located in Pittsburgh, Pennsylvania. 173:18–23 (Mr. Harris). The Eastern Area that Mr. Harris manages is responsible for the solicitation, award, administration, renewal, and termination of transportation contracts for the USPS in Ohio, Kentucky, Pennsylvania, West Virginia, Virginia, "a small piece of Indiana," New Jersey, and Delaware. *Id.* at 175:15–17, 177:6–8. In 2005

received nine exhibits in trial. Tr. *passim.* In addition, eighteen exhibits were admitted prior to trial pursuant to the court's Order of November 3, 2008. Order of Nov. 3, 2008. Following trial, the parties filed post-trial briefs and responses: [Plaintiff's Post–Trial Brief] (plaintiff's Brief or Pl.'s Br.); Defendant's Post–Trial Brief (defendant's Brief or Def.'s Br.); Plaintiff's Response to Defendant's Post–Trial Brief (plaintiff's Response or Pl.'s Resp.); and Defendant's Post–Trial Reply Brief (defendant's Response or Def.'s Resp.).

Plaintiff seeks to recover damages arising from an alleged breach of a contract by the government, specifically, the United States Postal Service (USPS), in connection with her alleged wrongful termination by the USPS. *Pinckney v. United States (Pinckney I)*, 81 Fed.Cl. 207, 208 (2008); Complaint (Compl.). Specifically, plaintiff claims that "Postmaster Todd Lee falsif[ied] documents, mail, and gave misleading reports to Postal officials to have [her] contract terminated." Compl. 1. Plaintiff claims that her "termination was based upon Postmaster Todd Lee['s] willful intent to destroy [her] career of 18 years of service to the [USPS]." *Id.* Plaintiff "pray[s] to recover the cost of [f]uture [c]ontracts and further relief as this court may seem proper." *Id.* (emphasis omitted). Defendant denies plaintiff's allegations, Defendant's Answer and Counterclaim (defendant's Answer or Def.'s Answer) ¶¶ 1, 3–11, and counterclaims for damages for breach of contract in the amount of $1,720.74, *id.* ¶ 32. Plaintiff filed plaintiff's Motion for Summary Judgment and plaintiff's Motion to Dismiss Defendant's Counterclaim on November 28, 2007. *Pinckney I*, 81 Fed.Cl. at 212–13. The court denied plaintiff's Motion for Summary Judgment and plaintiff's Motion to Dismiss Defendant's Counterclaim on March 28, 2008. *Id.* at 219. Plaintiff moved for reconsideration of the court's Opinion of March 28, 2008 on June 16, 2008, Plaintiff's

the Eastern Area also included North Carolina and South Carolina. *Id.* at 175:18–25. In 2005 Mr. Harris had a staff of twenty-two specialists, but he was the only official who held contracting authority. *Id.* at 177:20–25. Mr. Harris has been employed by the USPS for twenty-four years and has held his current position since March of 2003. *Id.* at 173:24–174:2. Mr. Harris was hired by the USPS in 1984 as a mail handler in Cincinnati, Ohio. *Id.* at 174:6–7. In 1990 he began working with transportation contracts in Columbus, Ohio and since then he has "held various positions in transportation contracts in Atlanta, Memphis and Pittsburgh." *Id.* at 174:7–10.

Kenneth Kirchner is a fact witness for defendant. Mr. Kirchner is a window clerk at the Pawleys Island Post Office. Tr. 60:9–10 (Mr. Kirchner). His job entails servicing customers while he is at the window and boxing mail while he is not at the window. *Id.* at 60:10–11. Boxing mail involves putting mail that is not delivered by the mail carriers in the proper post office boxes. *Id.* at 60:12–61:4. Mr. Kirchner has been at the Pawleys Island Post Office for eight years. *Id.* at 61:10–11. Prior to joining the USPS, Mr. Kirchner served for twenty-one years in the United States Air Force. *Id.* at 61:17–18.

Harold Todd Lee is a fact witness for defendant. Mr. Lee is the Postmaster at the Pawleys Island Post Office. Tr. 81:25–82:1 (Mr. Lee). Mr. Lee became Postmaster at Pawleys Island effective February 2005, but did not report for duty until late March of 2005 because he was held over at his prior position as manager of customer service in Myrtle Beach, South Carolina. *Id.* at 82:2–7, 83:21–24. Mr. Lee was first hired by the USPS in 1983 as a temporary employee. *Id.* at 82:13–14. He served as a night distribution clerk at a processing facility in Florence, South Carolina. *Id.* at 82:14–16. He then obtained another temporary position as a city delivery person and was eventually hired as a career city carrier in July of 1986. *Id.* at 82:16–21. In 1988 he was promoted to a building equipment mechanic for the Florence facility and surrounding offices. *Id.* at 82:22–24. In 1990 he was promoted to a postal operations analyst at the division office in Columbia, South Carolina. *Id.* at 83:2–4. In 1992, during "postal restructuring," he was promoted to facility specialist in Charlotte, North Carolina. *Id.* at 83:12–14. In 1995 he was promoted to manager of administrative services and contracting officer for the Greensboro District in Greensboro, North Carolina. *Id.* at 83:14–17. In 1999 Mr. Lee took the position of Postmaster in Conway, South Carolina. *Id.* at 83:18–19. In 2001 he became the manager of customer service for Myrtle Beach, South Carolina and served in that position until becoming the Postmaster at Pawleys Island in 2005. *Id.* at 83:20–24.

Wonderlyn Lorraine Bell Pinckney is the plaintiff in this case and a fact witness. Ms. Pinckney was a contract employee for the USPS for eighteen years prior to her termination on August 8, 2005. Tr. 244:19–20 (Ms. Pinckney); *Pinckney v. United States (Pinckney I)*, 81 Fed.Cl. 207, 210 (2008).

Audrey Smalls is a fact witness for plaintiff. Ms. Smalls is a contract mail carrier for the Pawleys Island Post Office. Tr. 221:22–222:3 (Ms. Smalls). She was employed as a contract carrier on July 2, 2005. *Id.* at 222:13–17.

Motion for Reconsideration of Court's Opinion (plaintiff's Motion for Reconsideration), and the court denied plaintiff's Motion for Reconsideration on July 29, 2008, *Pinckney v. United States (Pinckney II)*, 82 Fed.Cl. 627, 636 (2008).

On November 13, 2008 the court issued an order stating the following:

> On Thursday, November 13, 2008, at 10:00 a.m. Eastern Standard Time (EST), the court held a Telephonic Status Conference (TSC) with the parties. At the TSC the court reviewed the exhibit lists with the parties. Further to the TSC, the court will not retain [sic; "retain" should read "receive"] testimony or exhibits at trial to the extent such testimony or exhibits relate to contracts in force prior to the contract at issue in this dispute. The documents affected by this ruling are Joint Exhibit (JX) 1, JX 3, Defendant's Exhibit (DX) 1, DX 2, DX 3, and DX 4. The testimony of Keith Roy is also affected. Defendant may file a motion for reconsideration of this ruling on or before December 5, 2008.

Order of Nov. 13, 2008. On December 5, 2008 defendant "[sought] reconsideration of the Court's order [of November 13, 2008] that precludes defendant from introducing at trial in its case[-]in[-]chief any evidence, either documentary evidence or oral testimony, regarding the past performance of plaintiff on any Postal Service contract prior to the contract that was terminated for default by the Postal Service on August 8, 2005, Highway Contract Route [ (HCR) ] 29585." Defendant's Motion for Reconsideration (defendant's Motion for Reconsideration or Def.'s Mot. for Recons.) 1. After review of defendant's Motion for Reconsideration and relevant case law, the court concluded, in a published opinion, that "evidence of plaintiff's poor past performance on previous contracts does not appear to be of a type that make the allegation of breach here—the failure to deliver mail—more or less credible." *Pinckney v. United States (Pinckney III)*, 85 Fed.Cl. 392, 397 (2009). The court held that it would "not receive testimony or exhibits at trial to the extent such testimony or exhibits relate to contracts in force prior to the contract at issue in this dispute." *Id.*

II. Facts

"In 2001, plaintiff and defendant, acting through the [USPS], entered into a contract, contract no. HCR 29585 [ (2001 Contract) ], under which plaintiff was to deliver mail to mailboxes, both residential and commercial, in Pawleys Island, South Carolina." Def.'s Answer ¶ 13.[2] Harold Todd Lee (Postmaster Lee or Mr. Lee) is the postmaster at Pawleys Island, South Carolina. Tr. 81:25–82:1 (Mr. Lee). The 2001 contract was a renewal of a previous contract and was for a four-year term, from July 1, 2001, through June 30, 2005. Def.'s Answer ¶ 14. The 2001 contract was renewed for a second time on February 17, 2005 and was to run from July 1, 2005 until March 31, 2009 (2005 Contract). Defendant's Proposed Findings of Uncontroverted Fact (defendant's Facts or Def.'s Facts) ¶ 6. The 2005 Contract is marked as joint exhibit (JX) 2 (2005 Contract). Order of Nov. 3, 2008. This case concerns the events of Saturday, July 2, 2005 and plaintiff's subsequent termination. *See* Compl. 1; *see also* Def.'s Answer ¶¶ 18–25.

A. Events of July 2, 2005

Mr. Lee arrived at the Pawleys Island Post Office (Post Office) around 6:15–6:30 a.m. on Saturday, July 2, 2005. Tr. 55:1–3 (Mr. Fox). Postmaster Lee testified at trial as to the logistics of the operation of the Post Office. *Id.* at 116:25–119:15 (Mr. Lee). Mail trucks arrive at the Post Office at 6:30 a.m., 8:00 a.m. and 2:00 p.m.[3] *Id.* at 116:25–117:12

---

2. Facts pertaining to the existence of the contract and the job titles of postal employees that are cited to filings of only one of the parties do not appear to be in dispute.

3. The 2:00 p.m. truck brings express mail and non-preferential mail. Tr. 117:5–12 (Mr. Lee). Non-preferential mail is "mail that [is] not committed for delivery that day" or "bundles of mag-

azines and things like that." *Id.* at 117:9–12. The 2:00 p.m. truck may arrive at 1:50 p.m., but no earlier than that. *Id.* at 119:9–15. Mr. Lee was not sure whether mail arrived at 2:00 p.m. on July 2, 2005 because he was not at the Pawleys Island Post Office (Post Office) at that time, but he is sure that the truck arrived because otherwise there would have been "an irregularity report for the truck not arriving." *Id.* at 117:15–

(Mr. Lee). A floor plan of the Post Office was marked and entered as defense exhibit (DX) 16. *Id.* at 12:23–25; *see* DX 16. Plaintiff arrived at the Post Office at 7:15 a.m. on Saturday, July 2, 2005 and began to sort her mail. Tr. 249:5–11 (Ms. Pinckney). Mr. Lee left the post office sometime between 8:30 and 9:30 a.m. *Id.* at 89:14–16 (Mr. Lee). At around 10:30 a.m., plaintiff left to go out on her mail route. *Id.* at 255:3–10 (Ms. Pinckney). A map of plaintiff's route was marked and entered as DX 15. *Id.* at 12:20–23; *see* DX 15. The route covers some twenty-three miles, *see* JX 2 at 88–90, over a number of roads and several different areas, *see id.*; DX 15. Ms. Pinckney delivers mail to approximately 500 addresses, including a residential building that contains approximately 156 units. JX 2 at 86–90; Tr. 274:15–275:18 (Ms. Pinckney). In particular, the route includes a beach area at approximately .8 through 7.5 miles. *See* JX 2 at 88–90; DX 15.

When plaintiff first arrived at the beach area she was unable to get to the mailboxes to deliver the mail. Tr. 253:3–8 (Ms. Pinckney). Plaintiff called the Post Office immediately and spoke with Deborah Fox. *Id.* at 314:25–315:10 (Ms. Pinckney). Deborah Fox told her to call back so that Ms. Fox would have time to find Postmaster Lee's cell phone number. *Id.* at 315:3–5 (Ms. Pinckney). Plaintiff called Ms. Fox again and obtained Mr. Lee's cell phone number and then called Mr. Lee to explain the situation. *Id.* at 253:8–10 (Ms. Pinckney). Plaintiff testified that she was on Rope Makers Lane when she called Mr. Lee. *Id.* at 315:24–316:4 (Ms. Pinckney). According to plaintiff, the phone call took place around 11:00 a.m. *Id.* at 255:1–2 (Ms. Pinckney). Plaintiff testified that Mr. Lee told her "[t]o deviate from the line of travel and to get the rest of the boxes and come back to the beach." *Id.* at 255:12–14 (Ms. Pinckney). Plaintiff also testified that Mr. Lee called her "paranoid" and "not fit to deliver the mail" and told her that

maybe she should resign. *Id.* at 283:21–23 (Ms. Pinckney).

According to Mr. Lee, he received a phone call on his cell phone from plaintiff around 11:30 or 11:40 a.m. *Id.* 90:2–6 (Mr. Lee). Mr. Lee was out with his children and returning home at the time. *Id.* at 90:3–5 (Mr. Lee). Plaintiff stated that she was having a problem delivering her mail because " '[t]hose people were doing it again.' " *Id.* at 90:15–18 (Mr. Lee). Mr. Lee testified that plaintiff was referring to blocked boxes.[4] *Id.* at 90:21–24 (Mr. Lee). Mr. Lee testified as follows:

[S]o this was right at the 4th of July weekend. Pawleys Island is a tourists' community, and at that time I told her, I said well, they're just tourists, it's not anything they're doing intentionally, you know, just continue on, skip that part of your route, do the other part of your route, and return and deliver those boxes later and hopefully if there's people out there that are in your way, they'll be gone. And I'm paraphrasing. I don't know exactly, but that's the gist of the conversation. You know, there was some back and forth. As far as in the conversation, several times Ms. Pinckney interrupted me, and I think she even stated that Washington said she didn't have to deliver the mail or didn't have to put up with this harassment, and I think at that time I told her I don't know what you're talking about, I'm giving you authorization to deviate from your route, deliver the other part, return, but you must deliver that mail, we have to deliver that mail. At some point in the conversation I did state to her that this paranoid behavior was not going to be tolerated, that we had to get that mail delivered.

*Id.* at 90:24–91:22 (Mr. Lee).

After speaking with Mr. Lee, plaintiff completed the rest of her route, *id.* at 259:3–5 (Ms. Pinckney), and returned to the beach area around 1:00 p.m., *id.* at 261:13–19 (Ms.

118:2. When asked how the mail that comes in on the 2:00 p.m. truck is processed, Mr. Lee stated: "We try to work it that same afternoon, but oftentimes we don't, we work it the following day, the following business day." *Id.* at 118:3–14.

4. A blocked box is a mailbox to which a carrier's clear approach is obstructed while the carrier is in his or her vehicle. Tr. 92:2–17 (Mr. Lee).

Pinckney). According to plaintiff, when she arrived at the beach for the second time, a police office was waiting to escort her "to every box on the beach." *Id.* at 264:5–20 (Ms. Pinckney). Plaintiff finished her route and returned to the Post office around 1:20 p.m. *Id.* at 263:23–264:4 (Ms. Pinckney). Plaintiff testified that, upon returning to the Post Office, she deposited the outgoing mail and cased[5] all of her mail. *Id.* at 279:11–14 (Ms. Pinckney). Plaintiff testified that "there was no mail left at [her] case, other than a tub of hold mail." *Id.* at 279:15–16 (Ms. Pinckney).

When Mr. Lee arrived home he typed a memo summarizing his conversation with plaintiff and e-mailed it to himself from his personal e-mail to his business e-mail. *Id.* at 96:14–23 (Mr. Lee). The memo Mr. Lee wrote upon returning to his home on July 2, 2005 was admitted into evidence as DX 7. *Id.* at 125:8–9 (the Court). Mr. Lee's memo reads as follows:

Subject: HCR Contractor Wonderlyn Pinckney

Phone call to my personal cell phone. I answered the call (approximately 11:40 AM), it was Ms. Pinckney. She said she was unable to deliver the beach area. I asked why? She stated "they" were out driving around in front of her and intentionally blocking her from accessing the boxes. I said it probably tourists at the beach for the 4th of July weekend. Deliver the other part of your route and come back and maybe the traffic would have dropped off by then. She continued with "I have going through this with these people for years[.]" I asked "what people are you talking about?" [ ] She said "you know[.]" I said "Wonderlyn, we are not going to go down this path, these are just tourists[.]" Carry the rest of your route and come back and finish this at the end. She stated "Washington said I don't have to deliver this if I fear for my safety[.]" I responded "Wonderlyn, I have given you instructions, you cannot curtail delivery[.]" "If you feel you are unable to deliver the

mail on a daily basis as you are required, then maybe you should resign[.]" She said, "that's what you want anyway[.]" I responded[,] "Wonderlyn, that is ridiculous and I am not going to entertain this paranoid behavior[.]" I started to continue "you can finish this portion of the route a little" and she hung up before I could finish my sentence.

I contacted Deborah Fox (clerk in charge) at the office. I asked her (or Ken Kirchner) to let me know if Wonderlyn brought back mail and did not complete the route.

I am writing this memo immediately following the incident to document this the exact wording and details of the incident.

H. Todd Lee

Postmaster

Pawley's Island, SC 29585

Also, for the record, I am email [sic] this to my work email to document the time and day of this memo.

DX 7. The e-mail receipt, time stamped at 12:13 p.m. on July 2, 2005, was admitted into evidence, Tr. 125:8–9 (the Court), as DX 6. DX 6; Tr. 99:1–4 (Mr. Lee).

Mr. Lee testified that he called Ms. Fox between 11:45 a.m. and 12:15 p.m. and asked her call him if plaintiff brought any mail back from her route and to set aside any mail plaintiff brought back. *Id.* at 96:24–97:7 (Mr. Lee). Ms. Fox testified that she received a phone call from Mr. Lee around 1:45 p.m. *Id.* at 21:19–22 (Ms. Fox). When asked by the court if she could recall why Mr. Lee called her, Ms. Fox stated: "I don't remember exactly what he said, but he just said that she supposedly couldn't deliver some mail so she was supposedly—he just wanted to make sure that she did deliver it or didn't bring any back. He just said if she did, put it in his office." *Id.* at 22:2–7 (Ms. Fox). After Mr. Lee's phone call, Ms. Fox "went over to [plaintiff's] case and there was a flat tub, and what that is is a tub that comes with magazines and that in it. It's white and it's about a foot by foot by foot, and there was one on a three-wing case in the Post Office. Tr. 20:1–8 (Ms. Fox).

---

**5.** "Casing the mail" describes the process of putting all of the magazines and letters in "pigeon hole" slots corresponding to individual addresses

sitting on the top of her ledge of her case, and I carried that tub with some mail in it into Mr. Lee's personal office." *Id.* at 27:12–18 (Ms. Fox). Ms. Fox did not examine the tub of mail but "glanced in and [saw] that there was some mail in it." *Id.* at 28:2–3 (Ms. Fox). Ms. Fox could not tell how many pieces of mail were in the tub and did not look at any of the mail. *Id.* at 28:3–4 (Ms. Fox). She was not able to determine whether it was outgoing mail or collection mail.[6] *Id.* at 28:6–9 (Ms. Fox). Ms. Fox then called Mr. Lee to inform him that she had put the tub of mail on his desk. *Id.* at 28:12–14 (Ms. Fox). Mr. Lee testified that Ms. Fox called him at approximately 1:40 p.m. and stated that plaintiff had returned to the post office with " 'quite a bit of mail.' " *Id.* at 100:11–20 (Mr. Lee). Mr. Lee told her to put the mail plaintiff had brought back from her route on his desk and that he would come into the post office. *Id.* at 100:23–24 (Mr. Lee). Mr. Lee then "immediately" returned to the Post Office, a drive that took approximately 20 minutes. *Id.* at 101:3–11 (Mr. Lee). According to Ms. Fox, Mr. Lee returned to the post office around 2:30 p.m. *Id.* at 28:18–20 (Ms. Fox). Mr. Fox also stated that he saw Mr. Lee come back into the post office that afternoon and leave once, but he did not pay enough attention to see if Mr. Lee departed with mail. *Id.* at 55:18–56:1 (Mr. Fox).

Mr. Lee testified that when he arrived at his office there was a flat tub with mail in it sitting on his desk. *Id.* at 101:23, 103:24–104:1 (Mr. Lee). He spread the mail on the conference table in the post office conference room and "physically wrote down every address and counted the mail." *Id.* at 102:2–8 (Mr. Lee). Mr. Lee's handwritten list of addresses, titled "Mail Not Delivered" was admitted into evidence as DX 5. *Id.* at 123:10–14 (the Court); DX 5. According to Mr. Lee, he prepared DX 5 at approximately 2:40–3:00 p.m. on July 2, 2005. Tr. 110:8–2 (Mr. Lee). At trial Mr. Lee explained the contents of DX 5. *Id.* at 106:2–110:12 (Mr. Lee). DX 5 lists the total number of pieces of mail that plaintiff allegedly brought back

to the post office as 102. DX 5; Tr. 106:4–5 (Mr. Lee). Of the 102 pieces of mail, DX 5 lists the total pieces of first class mail as fifty-three. DX 5; Tr. 106:5–7 (Mr. Lee). In addition to listing the addresses corresponding to the 102 pieces of mail, DX 5 also lists five addresses that, according to Mr. Lee, had hold order requests on July 2, 2005. Tr. 109:4–11 (Mr. Lee); *see* DX 5. Mr. Lee testified that he included the addresses with hold orders in DX 5 because he thought "that at some point it may be alleged that the mail that was brought back was for addresses there were on hold, and so [he] just documented who was on hold that particular day, so that that issue was not valid." Tr. 109:17–21 (Mr. Lee). In addition to the five addresses listed on DX 5 with hold orders, Mr. Lee testified that some businesses on plaintiff's route do not receive mail on Saturdays. *Id.* at 110:1–2 (Mr. Lee). A typed version of Mr. Lee's handwritten inventory of mail that was not delivered on July 2, 2005 was admitted into evidence as JX 6. *Id.* at 140:22–141:2 (the Court). JX 6 was prepared by Mr. Lee and does not contain the addresses on hold listed in DX 5. *Id.* at 139:18–25 (Mr. Lee); JX 6.

Mr. Lee also stated that he "took photographs of the mail" with a disposable 35 millimeter camera and "had Deborah Fox and Ken Kirchner witness the mail." Tr. 103:14–17, 110:15–22 (Mr. Lee). Several photographs of mail were admitted into evidence as DX 10–A through 10–L. *Id.* at 122:19–23 (the Court). Mr. Lee testified that DX 10–A through DX 10–L are "the photographs that I took on July the 2nd of the mail that I had inventoried, as it was laying on the conference table." *Id.* at 111:14–16 (Mr. Lee). According to Mr. Lee, he took the photographs to further document the events of the day. *Id.* at 112:1–5 (Mr. Lee). Mr. Lee divided the mail into piles on the conference table to "determine the number of addresses and the type of mail." *Id.* at 144:22–24 (Mr. Lee). According to Mr. Lee there were twenty-five individual addresses where mail was undelivered. *Id.* at 146:8–9

---

**6.** Ms. Fox testified that "collection mail" is "mail that people would put in their mailboxes to go out that they would put stamps on, and she would collect them out of their mailboxes and bring them back to the post office to be distributed to our processing plant." Tr. 20:15–19 (Ms. Fox). The court understands "outgoing mail" to be mail delivered by the mail carriers.

(Mr. Lee). DX 10–A is a photograph of the allegedly undelivered mail that Mr. Lee sorted on the conference room table of the Post Office. LL at 111:14–16, 146:14–147:2 (Mr. Lee); DX 10–A. Mr. Lee testified that each pile in DX 10–A indicates an address. Tr. 146:25–147:2 (Mr. Lee). Mr. Lee, however, could only count twenty different piles in DX 10–A. Id. at 147:3–12 (Mr. Lee); see DX 10–A. Mr. Lee had the film developed at CVS at a later date, "[p]robably a couple of weeks" after July 2, 2005. Tr. 112:9–19 (Mr. Lee), 153:23 (Mr. Lee). Mr. Lee stated that he may have waited a couple weeks to develop the film because he was gathering documentation to give to the contracting officer. Id. at 153:24–154:3 (Mr. Lee).

According to Mr. Lee, Ms. Fox and Mr. Kirchner witnessed the mail between 2:45 p.m. and 3:00 p.m. Id. at 113:21–23 (Mr. Lee). Ms. Fox testified as follows:

> He had 25 different piles of mail that he says were 25 different addresses of each delivery, and I can recall counting the number of piles and I guess approximately a hundred pieces. I didn't count each piece, and I did see that one address for sure was Ocean Highway. I didn't know the exact address. And another one was Salt Marsh Cove, but I did not witness exactly what individual addresses they were.

Id. at 29:12–19 (Ms. Fox). Ms. Fox stated, "I'm assuming those were not collection mail," Id. at 30:11–12 (Ms. Fox), but she could not remember whether the stamp had been cancelled on the mail, Id. at 30:21–31:7 (Ms. Fox). On cross-examination, Ms. Fox testified that three carriers deliver to Ocean Highway. Id. at 49:10–12 (Ms. Fox).

Mr. Kirchner also testified that he and Ms. Fox were asked by Mr. Lee to go into the conference room to observe stacks of mail on the conference table. Id. at 62:16–63:11 (Mr. Kirchner). According to Mr. Kirchner, he saw "stacks of mail on the table." Id. at 63:4 (Mr. Kirchner). He did not count the number of pieces of mail, but he did notice that one piece of mail had an address of Salt Marsh Circle. Id. at 63:4–6 (Mr. Kirchner). On direct examination Mr. Kirchner stated that the pictures in DX 10–A, 10–B, and 10–

C depict "mail on the table in the conference room" and are "a representation of the mail Mr. Lee showed [him] on July 2nd, 2005." Id. at 68:1–13 (Mr. Kirchner). However, when questioned during cross-examination as to whether he could state with certainty whether the mail depicted in DX 10–A through 10–L is the same mail that was on the table on July 2, 2005, Mr. Kirchner stated that he could not. Id. at 74:15–20, 76:4–8 (Mr. Kirchner).

Ms. Fox did not witness Mr. Lee photograph the mail, Id. at 47:24–25 (Ms. Fox), and could not confirm that DX 10 contained the same mail Mr. Lee had asked her and Mr. Kirchner to witness on July 2, 2005, Id. at 42:24–43:2 (Ms. Fox). During her examination by Ms. Pinckney, Ms. Fox testified that she could not be certain she witnessed undelivered mail and that she did not see plaintiff return to the post office on July 2, 2005:

> Q: Okay. Did you witness the mail that is allegedly stated as being brought back undelivered as undelivered mail? Can you be certain?
>
> A: No, I cannot.
>
> . . . .
>
> Q: Did you witness [plaintiff] bringing back mail off the route that was allegedly undelivered back into the post office?
>
> A: I did not see [Ms. Pinckney] return from [her] contract route into the post office, no.
>
> Q: Okay. Did you tell Mr. Lee, Postmaster Todd Lee, on July 2nd, 2005, that [plaintiff] had brought back quite a bit of mail?
>
> A: I don't recall exactly what I said to him when I called him back. I think I just told him that there was a tub of mail on [Ms. Pinckney's] case that had mail in it. I don't recall saying an amount, no.

Id. at 43:13–44:10 (Ms. Fox). Ms. Fox also testified that it could be possible for third class mail to "be put on the ledge in one of the tubs" at a contract carrier's work station. Id. at 46:15–21 (Ms. Fox).

Mr. Lee testified that he then put the mail in a tray, took it to the Route 3 distribution

case, and delivered the mail. *Id.* at 114:9–15 (Mr. Lee). Mr. Lee stated that he was able to find slots for all of the allegedly undelivered mail. *Id.* at 142:17–23 (Mr. Lee). He stated that he left the post office around 3:30 p.m. and returned to the post office around 5:00 p.m. *Id.* at 114:25–115:10 (Mr. Lee). Mr. Lee testified that he did not return with any undelivered mail and that no boxes were obstructed. *Id.* at 115:11–15 (Mr. Lee). Specifically, Mr. Lee testified that he delivered to 631 Springs Avenue, *id.* at 155:21–156:3 (Mr. Lee), 66 Lachicotte, *id.* at 159:25–160:1 (Mr. Lee), and 10744B Ocean Highway, *id.* at 160:6–11 (Mr. Lee). On cross-examination, plaintiff questioned Mr. Lee as to why, upon seeing the allegedly undelivered mail, he did not call plaintiff to give her a second chance to deliver the mail. *Id.* at 147:18–21 (Mr. Lee). Mr. Lee responded: "I needed to [e]ffect delivery of the mail in a timely fashion, and I'm not even sure I had handy your contact information. I probably could have found it, but also at that point I thought that your behavior on the phone earlier exhibited that this was a willful action and that ultimately it's my responsibility to just make sure we got this mail delivered quickly." *Id.* at 147:22–148:3 (Mr. Lee). On direct examination, Mr. Lee stated that delaying the mail is a serious problem and is "considered a serious offense." *Id.* at 116:6–8 (Mr. Lee).

Ms. Fox testified that she did not see Mr. Lee take the mail out of the Post Office on July 2, 2005 and that she did not know "whether Mr. Lee was still in the building when [she] left around 3:00 p.m." *Id.* at 37:17–20 (Ms. Fox). However, "[g]iven the layout of the building, . . . it [would] be possible for Mr. Lee to be in the building and [Ms. Fox] not see him when he left the building[.]" *Id.* at 37:21–24 (Ms. Fox). Mr. Kirchner testified that he did not see plaintiff bring back any mail on July 2, 2005, nor did he witness Ms. Fox bringing the mail from plaintiff's work station on July 2, 2005. *Id.* at 73:11–17 (Mr. Kirchner). Mr. Kirchner did not witness Mr. Lee coming to the Post Office or leaving the Post Office on the afternoon of July 2, 2005. *Id.* at 74:4–10 (Mr. Kirchner).

### B. Events Following July 2, 2005 and Prior to Plaintiff's Termination

The next business day following July, 2, 2005, which the court understands to have been Tuesday, July 5, 2005, Mr. Lee wrote a follow-up memo upon his arrival at work. *Id.* at 125:22–126:1 (Mr. Lee). Mr. Lee's follow-up memo was admitted as DX 8. *Id.* at 130:15 (the Court). According to Mr. Lee, he created DX 8 "to document after arriving at work what action [he] took and also to show that appropriate disposition of the mail was [e]ffected." *Id.* at 126:22–24 (Mr. Lee). DX 8 states:

HCR 29585—Incident date 7/2/5

Follow up memo

Deborah Fox (204B) contacted me at 1:50 PM to let me know route carrier W. Pinckney had brought back quite a bit of mail (I had called earlier and asked that she look at this upon Ms. Pinckney's return).

I immediately left for the Post Office. I arrived at approximately 2:20 PM. I inventoried the undelivered mail. There were 102 [pieces] total, 53 [pieces] of [First Class Mail]. I listed the addresses of each undelivered piece. There were a total of 25 individual addresses including one entire cluster box at 10744 Ocean Highway. I photographed the mail, had two career employees witness (D.Fox, K.Kirchner).

I loaded the mail into my personal vehicle and delivered the mail.

Most of the location were not on the Island and would not have been affected by the issues raised by Ms. Pinckney.

DX 8.

Mr. Lee testified that he initially contacted Mr. Harris on Tuesday, July 5, 2005, and recommended that plaintiff be terminated for default. Tr. 129:7–20. Mr. Lee stated that he contacted Mr. Harris because it was "a serious offense" and he "thought that some administrative action was appropriate." *Id.* at 128:1–3 (Mr. Lee). Mr. Lee has authority to take action against employees of the USPS, but not contractors. *Id.* at 128:4–14 (Mr. Lee). Mr. Harris confirmed that in his telephone conversation with Mr. Lee on July 5, 2005, Mr. Lee informed him of "the inci-

dent with Ms. Pinckney and the non-delivery of mail on Saturday, July the 2nd." *Id.* at 178:12–16, 179:23 (Mr. Harris). Mr. Lee based his recommendation on "[t]he seriousness of the offense, and basically that she had failed to meet the obligations under the contract, and in [his] opinion was about as severe as you can get as far as violation of your agreement." *Id.* at 129:22–130:1 (Mr. Lee). Furthermore, Mr. Lee stated that he had experience dealing with postal employees and felt that contract employees should be held to the same standard. *Id.* at 130:1–5 (Mr. Lee).

After informing Mr. Harris of the situation, Mr. Lee documented on a vehicle timecard the miles he allegedly traveled delivering mail on July 2, 2005. *Id.* at 130:21–25 (Mr. Lee). A vehicle time record with entries for Mr. Lee's use of his personal vehicle for official use was admitted as DX 11. *Id.* at 131:18–132:1 (the Court). DX 11 lists the daily miles for July 2, 2005 as 14. DX 11; Tr. 132:24–133:1 (Mr. Lee) (stating that 14 refers to "the number of miles [Mr. Lee] drove in order to [e]ffect delivery of the undelivered mail"). Mr. Lee submitted his vehicle time record for reimbursement on July 19, 2005. Tr. 133:8–12 (Mr. Lee); DX 11; DX 12. DX 12 "documents when [Mr. Lee] actually submitted [DX 11] electronically." Tr. 133:22–23 (Mr. Lee). Mr. Lee's reimbursement request was reviewed and approved by his supervisor, Bruce Fowler, who was located in Charleston, South Carolina. *Id.* at 134:7–20 (Mr. Lee). Mr. Lee then sent his original memo, DX 7, the follow-up memo, DX 8, and "other documentation" to

the contracting officer, Mr. Keith Harris, Tr. 127:6–16 (Mr. Lee).

After speaking to Mr. Lee, Mr. Harris decided that he wanted to send Ms. Pinckney a show cause notice. *Id.* at 180:25–181:1 (Mr. Harris). Mr. Harris also met with the specialist for Pawleys Island, Donna Moore, to explain his understanding of the situation and to request that Ms. Moore "gather up all the data and bring it to [him]." *Id.* at 181:1–12 (Mr. Harris). The Show Cause Notice, dated July 7, 1005, is marked as JX 3. Order of Nov. 3, 2008 at 4. Mr. Harris testified that he wrote the Show Cause Notice and that Ms. Moore signed and mailed it. Tr. 182:7–14 (Mr. Harris). According to Mr. Harris, the purpose behind the Show Cause Notice was "to gather up as much information from all sides to figure out what had actually happened on July the 2nd." *Id.* at 182:19–21 (Mr. Harris). Mr. Harris stated that he issues approximately forty or more show cause notices per year, of which approximately thirty percent do not result in terminations. *Id.* at 183:1–11 (Mr. Harris). Mr. Harris testified that he would not default a contract if he "understood that, although a mistake may have happened, the supplier took due precaution to make sure, you know, it was unavoidable and the supplier realizes that and has put measures in place to see that it doesn't continue, then I would not be likely to terminate the route." *Id.* at 183:15–21 (Mr. Harris).

On July 7, 2005, the contracting officer, Keith Harris, sent plaintiff a Show Cause Notice, that was admitted into evidence as JX 3.[7] Order of Nov. 3, 2008 at 4; JX 3. The

---

7. The Show Cause Notice reads in full as follows:

On September 10, 2004, you received a letter of warning from this office. In that letter, you were given notice that satisfactory service must be restored and maintained during the term of your contract.

It has come to my attention that on Saturday, July 2, 2005, while on your route, you contacted your Postmaster, Todd Lee, about a problem in delivering the mail in the "beach area[.]" The Postmaster told you not to curtail mail, but that you could deviate from the line of travel. He told you that you could go back · to the beach area later, but that you must deliver all mail available that day. You returned to the office with mail for approximately 25 houses for Ocean Highway (not the beach

area) and went home early. This undelivered mail included 53 pieces of first class mail. You failed to follow clear and direct instructions from your Postmaster.

Your failure to deliver all mail available that day and disregard for the instructions of the Postmaster constitute an event of default under clause B–69, Section a, of the contract.

This Show Cause notice gives you the opportunity to provide a written explanation of your actions in this matter. Your response may also include any information that you would like the Postal Service to consider in deciding whether to issue default termination on the contract. Your response must be received in the Eastern Area Office no later than close of business Friday, July 15, 2005.

Show Cause Notice directed that no later than July 15, 2005, plaintiff "provide a written explanation of [her] actions" on July 2, 2005. JX 3. The Show Cause Notice stated that "[plaintiff's] response may also include any information that [she] would like the Postal Service to consider in deciding whether to issue default termination on the contract." *Id.* Mr. Lee stated that the Show Cause Notice was based on facts that he submitted to Mr. Harris. Tr. 163:17–18 (Mr. Lee). Mr. Lee testified that in his communications with Mr. Harris he specified that 25 addresses, not Ocean Highway addresses, were not delivered to. *Id.* at 164:11–17 (Mr. Lee). The Show Cause Notice states that "25 houses for Ocean Highway (not the beach area)," were not delivered to on July 2, 2005. JX 3. According to Mr. Lee, this mistake must have been due to a "misinterpretation of his memos," Tr. 165:5–6 (Mr. Lee), although he feels that his memos were clear, *id.* at 165:18–22 (Mr. Lee). Mr. Harris testified that the phrase "25 houses for Ocean Highway" came from Postmaster Lee, but he did not remember whether it came from a telephone conversation or from an e-mail. *Id.* at 185:11–14 (Mr. Harris).

> If the Postal Service should decide to pursue its right of termination for default, it may procure services similar to those so terminated, and you will be liable to the Postal Service for any excess costs of replacement service.
>
> Questions on this matter may be addressed to Donna Moore at [xxx-xxxxxxx].

Joint Exhibit (JX) 3. The court notes that the first sentence of the Show Cause Notice refers to an event prior to the term of the contract at issue. *See* JX 3; *see supra* Part I.

8. Plaintiff's Response to the Show Cause Notice reads in full as follows:

> On Friday, July 1[st], 2005, Postmaster Todd Lee, called me into his office upon my arrival. He stated that it wasn't anything wrong, but he needed to do an quarterly evaluation report. He stated the following:
>> I am a very good worker
>> He don't get complaints on my route.
>
> Several other positive comments were stated July 2[nd], 2005, I called Postmaster Todd Lee to report problems in my attempt to deliver the mail. He instructed me to deviate from the line of travel, he also stated the following:
>> I'm paranoid
>> I'm not fit to deliver the mail
>> I should just resign
>> He began to shout abusive language & he became very hostile
>> I abruptly hung up the phone.

Plaintiff responded to the Show Cause Notice on July 13, 2005. JX 4. Her response was admitted into evidence as JX 4.[8] Order of Nov. 3, 2008 at 4. In her response to the Show Cause Notice, plaintiff stated:

> I NEVER, NEVER, NEVER FAIL TO DELIVER THE U.S. MAIL. I DID NOT SKIP ANY MAILBOX THAT I COULD DELIVER TO. I'VE PROVEN MY COMMITMENT TO THE U.S. POSTAL SERVICE OVER THE YEARS, WITHOUT QUESTION.

JX 4.

Ms. Fox testified that, a week after the events of July 2, 2005, "Mr. Lee asked [her] to write a statement as to the effect of what transpired on July the 2nd." Tr. 33:16–19 (Ms. Fox). Ms. Fox wrote a statement and gave it to Mr. Lee. *Id.* at 34:3–5 (Ms. Fox). This handwritten statement was entered into evidence as JX 7. Order of Nov. 3, 2008 at 4; Tr. 33:1–6 (Ms. Fox). JX 7 states:

> On 7-2-05 at approx. 1:45 PM, Postmaster Todd Lee, called and asked me to put any mail that Wonderlyn Pinckney brought back from her Route on his desk. So I put the flat tub of some mail on his desk as

> These are ill-considered false-statements by Postmaster Todd Lee–I have been unjustly accused, wrongly treated by the Postmaster. These are very harsh unacceptable words spoken by Postmaster Todd Lee.
>
> I NEVER, NEVER, NEVER FAIL TO DELIVER THE U.S. MAIL. I DID NOT SKIP ANY MAILBOX THAT I COULD DELIVER TO. I'VE PROVEN MY COMMITMENT TO THE U.S. POSTAL SERVICE OVER THE YEARS, WITHOUT QUESTION.
>
> The only instance that would warrant the mail not being delivered is the following:
>> MAIL BOX BLOCKED
>> STREET/ROAD UNACCESSIBLE DUE TO CONSTRUCTION
>> MAIL BOX IS DOWN
>
> I SOLEMNLY REPEAT, I DON'T PLAY GAMES WITH THE MAIL. I TAKE PRIDE IN MY WORK. I LOVE DELIVERING THE U.S. MAIL.
>
> These false accusation by Postmaster Todd Lee is to besmirch my character, ruin my career with the U.S. Postal Service. Please consider the facts, one day he's praising me for my good works, the next day he's speaking words of anger. This is an emotional Postmaster who needs to enroll in ANGER MANAGEMENT.

JX 4.

requested. Then at 2:30 pm, the PM Todd Lee asked Ken Kirchner and myself to witness the mail that she had not delivered that day. There was approximately 100 [pieces] of 25 Individual Addresses. Then the PM said he was going out to deliver it.

JX 7. Ms. Fox testified that Mr. Lee did not tell her "what to write in the statement." Tr. 34:9–11 (Ms. Fox).

Mr. Kirchner also testified that he wrote a statement at Mr. Lee's request. *Id.* at 69:8–70:19 (Mr. Kirchner). Mr. Kirchner testified that he recognized the document marked as JX 8 as a handwritten statement he was asked to write by Mr. Lee. *Id.* at 69:8–25 (Mr. Kirchner). The document marked as JX 8 is dated July 21, 2005. Order of Nov. 3, 2008 at 4; JX 8. Mr. Kirchner testified that, to the best of his recollection, July 21, 2005 was the date he wrote the document. Tr. 70:1–8 (Mr. Kirchner). "We were just asked by the postmaster to write what we seen and I wrote on the paper what I seen on the table." *Id.* at 70:17–19 (Mr. Kirchner). After writing the statement contained in JX 8, Mr. Kirchner gave it to Mr. Lee. *Id.* at 70:11–13 (Mr. Kirchner). JX 8 states:

21 July, 2005

On July 2, 2005 I was asked to come to the conference room to view some mail that was brought back by the HCR Carrier of route 3.

The conference table was full of mail. Some piles were bigger than others.

I did notice one of the addresses was Salt Marsh Cove. This was the only address I noticed.

JX 8. Mr. Kirchner testified that he stated that the mail "was brought back by the HCR Carrier of Route 3" because the postmaster, Mr. Lee, informed him of that fact. Tr. 77:23–78:11 (Mr. Kirchner). Neither Ms. Fox nor Mr. Kirchner could remember if they wrote their statements at the same time. *Id.* at 47:9–14 (Ms. Fox), 72:10–12 (Mr. Kirchner). Mr. Lee testified that he asked Ms. Fox and Mr. Kirchner to write their statements "for additional documentation" and that he did not tell either Ms. Fox or Mr. Kirchner what to write in their statements. *Id.* at 136:2–5 (Mr. Lee).

Shortly after July 2, 2005, *id.* at 36:22–37:2 (Ms. Fox), Ms. Fox was contacted by plaintiff by telephone, *id.* at 34:17–18 (Ms. Fox). Plaintiff asked Ms. Fox several questions concerning the events of July 2, 2005 and requested that Ms. Fox confer with Mr. Kirchner and try to provide her with some answers. *Id.* at 34:18–24 (Ms. Fox). After speaking with Mr. Kirchner, Ms. Fox "jotted down" answers to plaintiff's inquiries and these answers are marked as plaintiff's exhibit (PX) 1. at 34:12–35:13 (Ms. Fox), 49:23–50:17. Ms. Fox then gave the piece of paper with her answers to Ms. Smalls, *id.* at 35:16–18 (Ms. Fox), who gave it to Ms. Pinckney, at 223:11–12 (testimony from Ms. Smalls that Ms. Fox gave her the paper and that she gave it to plaintiff). PX 1 states:

Talked to Ken [and] this is the info we remember.

-We did work on Sat. 7–2

-Ken & I witnessed on Sat.

-Todd did come in on Sat.

-Statements were taken later

-No actual addresses given

-Todd did not go out as far as Ken [and] I know

-Doug & I were on vacation when they fired her

PX 1. Ms. Fox testified that PX 1 "wasn't a statement. It was just some answers that we tried to recall. It was shortly after that incident happened but I can't tell you for sure what questions they were." Tr. 36:18–21 (Ms. Fox). Ms. Fox testified that she has no idea what she meant by the statement "Todd did not go out as far as Ken [and] I know" contained in PX 1. *Id.* at 37:5–10 (Ms. Fox).

### C. Plaintiff's Termination

Mr. Harris saw plaintiff's response to the Show Cause Notice on or about July 13, 2005. *Id.* at 186:22–187:1 (Mr. Harris). He testified that he did not recall having further contact with plaintiff after his receipt of plaintiff's response to the Show Cause Notice. *Id.* at 187:16–188:1 (Mr. Harris). Mr. Harris testified, *id.* at 188:8–189:20 (Mr. Harris), that he received Mr. Lee's July 5, 2005 follow-up memo, DX 8, photographs, DX 10A–L, and statements from Ms. Fox and

Mr. Kirchner, JX 7; JX 8. Mr. Harris then took some additional time to think the matter over and issued a termination for default. Tr. 189:24–190:10 (Mr. Harris) ("Termination is really a very serious thing to me, so I gathered all the information and took some time to digest and consider, and then at some point—I don't have the date in front of me—I issued the termination for default."). The termination for default letter, dated August 8, 2005 and authored by Mr. Harris, is marked as JX 5. *See id.* at 191:5–10 (Mr. Harris); Order of Nov. 3, 2008 at 4; JX 5.[9] The termination letter stated that plaintiff did not deliver all deliverable mail on July 2, 2005 and that plaintiff "did not adequately address the issue of non-delivered deliverable mail" in her response to the Show Cause Notice. JX 5 at 1. The termination letter also informed plaintiff of the Postal Service's right to seek damages from plaintiff. *Id.* According to defendant, "[p]laintiff's failure to perform service according to the terms of the contract and her failure to offer an explanation of her non-performance constituted a breach of the contract." Def.'s Answer ¶ 26. The USPS entered into an emergency replacement contract for mail delivery follow-ing plaintiff's termination, allegedly causing USPS to suffer damages in the alleged amount of $1,720.74. *Id.* ¶ 27–30.

## D. Relevant Contract Terms

The dispute appears to implicate the following sections of the 2005 Contract: Section B. Statement of Work and Specifications, JX 2 88–101, and HCR Terms and Conditions, *id.* at 112–52. Under section B.1.4.f of the 2005 Contract, plaintiff was "required to perform box delivery services to the customers and all other related services as outlined in Section B.3 ... or as directed by the contracting officer or authorized representative." *Id.* at 91. Section B.3.a of the 2005 Contract states that "[t]he supplier shall carry all mail tendered for transportation under this contract, whatever may be its size and weight, with certainty, celerity, and security, in accordance with the operating schedule." *Id.* at 92. Furthermore, under section B.3.j,

If Section B or another part of this contract calls for 'box delivery' or similar services, the supplier shall, when so directed by the contracting officer, perform any or all of the following: (1) The supplier may

9. The Termination for Default letter reads in full as follows:

Enclosed is a copy of Form 7440 terminating your right to perform service on Highway Contract Route 29585 Pawleys Island Box Delivery, as of the close of business August 9, 2005. On July 2, 2005, despite the explicit instructions of the Administrative Official you did not deliver all deliverable mail. On July 7, 2005, you were issued a Show Cause Notice from this office that extended to you an opportunity to explain your actions of Saturday July 2, 2005. Your response to that notice was received on July 13, 2005 and did not adequately address the issue of non-delivered deliverable mail.

Consequently, your right to perform service on this route is terminated under Section H.4., Termination For Default (Clause B–71) of the Request For Proposal Transportation Contract General Clauses, for failure to perform service according to the terms of the contract.

This action does not relieve you of the obligations you assumed when you renewed the contract effective [July] 1, 2005. Section H.6. (Clause B64) of the Request For Proposal Transportation Contract General Clauses, allows the Postal Service the right to seek damages equal to the actual excess costs incurred for the performance of this service through the remainder of the contract term. You will be notified in a subsequent letter of the exact amount of damages you owe.

This is the final decision of the Contracting [O]fficer. Under the Contract Disputes Act of 1978 and the clause of your contract entitled *Claims and Disputes,* you may appeal this decision to the Postal Service Board of Contract Appeals. If you decide to make an appeal to the Board of Contract Appeals, you must provide written notice (preferably in triplicate) to the Contracting [O]fficer within 90 days from the date you receive this decision. The notice should identify the contract by number, reference this decision, and indicate that you intend to appeal. In taking an appeal to the Board of Contract Appeals, you may include in your notice of appeal an election to proceed under the Board's Accelerated procedure, which provides for a decision within approximately 180 days. If you do not make an election in the notice of appeal, you may do so by written notice anytime thereafter.

In lieu of appealing this decision to the Board of Contract Appeals, you may bring an action directly on the claim in the United States Court of Federal Claims. You must file this action within twelve months of the date you receive this decision.

Questions on this matter may be addressed to Doug Veatch of my staff at [xxx-xxx-xxxx]. JX 5.

be required to provide the following services under this contract: (a) Deposit all mail matter received for that purpose from a post office into the appropriate customer mail boxes....

*Id.* at 94–95.

The HCR terms and conditions "apply to all solicitations and contracts." *Id.* at 113 (Preface to HCR Terms and Conditions). Among the general clauses included in the HCR Terms and Conditions is the following clause, contained in section 2.3.1, which contemplates terminations for default, and, in case the USPS improperly terminates for default, the conversion of the termination for default into a termination for convenience:

> m. *Termination for Default. The Postal Service may terminate this contract, or any part hereof, for default by the supplier,* or if the supplier fails to provide the Postal Service, upon request, with adequate assurances of future performance. In the event of termination for default, the Postal Service will not be liable to the supplier for any amount for supplies or services not accepted, and the supplier will be liable to the Postal Service for any and all rights and remedies provided by law. The debarment, suspension, or ineligibility of the supplier, its partners, officers, or principal owners under the Postal Service's procedures (see United States Postal Service Purchasing Manual *3.7* ) may constitute an act of default under this contract, and such act will not be subject to notice and cure pursuant to any termination of default provision of this contract. *If it is determined that the Postal Service improperly terminated this contract for default, such termination will be deemed a termination for convenience.*

*Id.* at 127 (emphasis added).

Section 2.3.1(s)(8) of the HCR Terms and Conditions incorporated by reference Clause B–69 of the United States Postal Service's Purchasing Manual. *Id.* at 128; *see* United States Postal Service Interim Internal Purchasing Guidelines, Appx. B (Contract Clauses), Clause B–69 Events of Default (May 19, 2005, Updated with Postal Bulletin Revisions Through Jan. 19, 2006) 319–320, *available at* http://www.usps.com/cpim/ftp/manuals/ipm/ ipmb.pdf (last visited July 28, 2009) (Clause B–69). Clause B–69 specifies certain events of default which may give rise to termination. Clause B–69. These events include the default alleged here, "failure to perform services:"

> The supplier's right to perform this contract is subject to termination under the clause entitled Termination for Default. The following constitute events of default, and this contract may be terminated pursuant to that Clause.
>
> a. The supplier's failure to perform service according to the terms of the contract[.]

Clause B–69(a). Section 2.3.3 of the HCR Terms and Conditions contains the clause pertaining to termination for convenience. JX 2 at 130. Section 2.3.3 states:

> The Postal Service reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the supplier must immediately stop all work and must immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the supplier will be paid a percentage of the work performed prior to the notice of termination. The supplier will not be paid for any work performed or costs incurred which reasonably could have been avoided.

*Id.* Section 2.3.3a states:

> The Contracting Officer, on 60 days written notice, may terminate this contract or the right to perform it, in whole or in part. Liquidated damages under Clause B–67 will apply to box delivery routes. The supplier shall be paid as liquidated damages the sum provided for in the *Changes (Transportation)* clause. The liquidated damages permitted by this contract, if any, constitute the supplier's full remedy for a whole or partial termination under this clause. For any other type of surface transportation contract, the Postal Service shall not be liable for any damages for a termination effected under this clause.

*Id.* Section 2.3.2 of the HCR Terms and Conditions is titled "Changes (Transportation) (Clause B–67) (April 2004) (Modified)."

*Id.* at 129. Section 2.3.2(e) of the HCR Terms and Conditions is titled "Liquidated Damages." *Id.* at 130. Section 2.3.2(e) states:

Unless otherwise specified on the transportation renewal document (PS Form 7447) or the notice of acceptance document (PS Form 7409), liquidated damages will apply to *box delivery contracts* only (i.e. this clause does not apply to Combination or Highway Transportation Contracts).

(1) If a Regular (i.e. this clause does not apply to Temporary or Emergency Contracts) Box Delivery Contract is terminated for convenience during the term of the contract due to the implementation of Delivery Point Sequence, Reclassification, Priority Mail Processing Centers, or Integrated Mail Handling Systems, without fault on the part of the supplier, liquidated damages for the termination will be established as one-twelfth of the annual rate. In the event of a partial termination for convenience or other service curtailment for these causes, liquidated damages shall be established in the same proportion as the dollar amount of the contract rate reduction bears to the amount established above.

(2) In all other cases, if a Regular Box Delivery Contract is terminated for convenience without fault on the part of the supplier, liquidated damages for the termination will be established as:

(i) One third of the annual rate (if during the first two years), or

(ii) One-sixth of the annual rate (if during the third year), or

(iii) One-twelfth of the annual rate (if during the fourth year).

In the event of a partial termination for convenience or other service curtailment liquidated damages shall be established in the same proportion as the dollar amount of the contract rate reduction bears to (2)(i), (ii), or (iii) above (as applicable).

*Id.*

## III. Legal Standards

The United States Court of Federal Claims (Court of Federal Claims) has jurisdiction to "render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (2006). The court does not have jurisdiction to render judgment upon actions sounding in tort. *Id.* "The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract[.] ..." 28 U.S.C. § 1491(a)(2). Section 10(a)(1) of the Contract Disputes Act is codified at 41 U.S.C. § 609(a)(1) and states:

Except as provided in paragraph (2), and in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary.

41 U.S.C. § 609(a)(1). The decision of the contracting officer to terminate a contractor for default is reviewed de novo by the Court of Federal Claims. 41 U.S.C. § 609(a)(3); *McDonnell Douglas Corp. v. United States (McDonnell Douglas II)*, 76 Fed.Cl. 385, 415 (2007).

Default termination is a " 'drastic sanction ... which should be imposed (or sustained) only for good grounds and on solid evidence.' " *McDonnell Douglas II*, 76 Fed. Cl. at 415 (quoting *J.D. Hedin Constr. Co. v. United States*, 187 Ct.Cl. 45, 57, 408 F.2d 424, 431 (1969)) (omission in original). "Termination is a forfeiture that is disfavored in the law and to be construed narrowly by the courts." *Id.* (citing *DeVito v. United States*, 188 Ct.Cl. 979, 990, 413 F.2d 1147, 1153 (1969)). The burden is on the government to prove by a preponderance of the evidence that a termination for default was justified. *Lisbon Contractors, Inc. v. United States (Lisbon)*, 828 F.2d 759, 765 (Fed.Cir.1987). "[T]here must be a nexus between the government's decision to terminate for default and the contractor's performance." *McDonnell Douglas Corp. v. United States (McDonnell Douglas I)*, 182 F.3d 1319, 1329 (Fed. Cir.1999). However, a "contracting officer

has broad discretion to determine whether to terminate a contract for default" and this decision will be overturned only if it is " 'arbitrary, capricious, or constitutes an abuse of discretion.' " *Consol. Indus., Inc. v. United States*, 195 F.3d 1341, 1343–44 (Fed.Cir.1999) (quoting *McDonnell Douglas I*, 182 F.3d at 1326). There are four factors relevant to this determination: "(1) evidence of subjective bad faith on the part of the government official, (2) whether there is a reasonable, contract-related basis for the official's decision, (3) the amount of discretion given to the official, and (4) whether the official violated an applicable statute or regulation." *McDonnell Douglas I*, 182 F.3d at 1326.

■ If the government meets its burden of proving that a termination for default was justified, the burden shifts to the contractor to show that the non-performance was excused. *Keeter Trading Co. v. United States (Keeter I)*, 79 Fed.Cl. 243, 253 (2007) ("If the government succeeds in proving default, the plaintiff then must demonstrate 'that the default was excusable under the terms of the contract.' " (quoting *Airport Indus. Park, Inc. v. United States*, 59 Fed.Cl. 332, 338 (2004))); *Lassiter v. United States*, 60 Fed. Cl. 265, 268 (2004). A plaintiff can show the default was excusable "by showing that improper government actions were the primary or controlling cause of the default." *Keeter I*, 79 Fed.Cl. at 253.

■ If the court determines that the termination for default was improper, the termination for default is converted into a termination for convenience. *Id.* at 262. Damages for a termination for convenience "are limited to costs incurred prior to termination, a reasonable profit on work performed, and certain additional costs associated with termination." *Id.* However, if plaintiff can demonstrate that the decision to terminate the contract was made in bad faith, traditional breach of contract damages may be awarded. *Id.* at 263. The goal of such damages is to "plac[e] the injured party in as good a position as it would have been had the breaching party fully performed." *Id.*

■ "[E]ven in cases in which a contractor has technically defaulted on its contractual obligations, the court will not uphold a default termination where the agency has acted in bad faith in administering the contract." *Id.* at 252 (citing *Moreland Corp. v. United States*, 76 Fed.Cl. 268, 293 (2007) and *Libertatia Assocs., Inc. v. United States (Libertatia)*, 46 Fed.Cl. 702, 712 (2000)). "The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner." *Centex Corp. v. United States (Centex)*, 395 F.3d 1283, 1304 (Fed.Cir.2005). Agents of the government are presumed to "discharge their duties in good faith." *Keeter I*, 79 Fed.Cl. at 252; *Libertatia*, 46 Fed.Cl. at 706. Plaintiff must provide "clear and convincing" evidence of improper motive on the part of the government because "showing a government official acted in bad faith is intended to be very difficult." *Am–Pro Protective Agency, Inc. v. United States (Am–Pro)*, 281 F.3d 1234, 1239–40 (Fed.Cir.2002); *Libertatia*, 46 Fed.Cl. at 706 ("In order to overcome this presumption, plaintiff must allege and prove, by clear and strong evidence, specific acts of bad faith on the part of the government."). Thus, the plaintiff must show that the government had a specific intent to injure plaintiff. *Keeter I*, 79 Fed.Cl. at 263. Bad faith has been found when the government's conduct was "designedly oppressive" or "initiated a conspiracy to get rid of a contractor." *Id.* at 264 (internal quotations omitted).

IV. Discussion

Plaintiff's initial argument is that the 2005 Contract, marked as JX 2, is not the contract agreed to by the parties. *See* Pl.'s Br. 1. The document plaintiff considers to be the actual written agreement of the parties was reviewed by the court at trial. *See* Tr. 289:1–25. The court found the document "incomplete." *Id.* at 289:6–8. The court noted that the document "was copied by a person who didn't realize that there are even and odd pages.... [T]hey copied only the odd numbered pages." *Id.* at 289:13–17. The court also informed plaintiff that just because someone failed to copy the even numbered pages "does not mean that the contract terms that are on even numbered pages are

ineffective. They're effective." *Id.* at 289:23–25. Plaintiff also argues that she was wrongfully terminated for default, Pl.'s Br. 4, and requests that "the [c]ourt ... grant ... judgment in [her] favor," *id.* at 5. Defendant asserts that "the [c]ourt should uphold the default termination of plaintiff's contract and defendant's assessment of excess reprocurement costs." Def.'s Br. 1.

### A. Whether Termination for Default was Proper

The primary factual issue in this case concerns whether plaintiff returned to the Post Office with undelivered but deliverable mail on July 2, 2005. See *Pinckney I*, 81 Fed.Cl. at 218. Defendant argues that plaintiff violated her contract with the USPS by failing to deliver all deliverable mail.[10] Def.'s Br. 2. Defendant's argument is based in large part on the testimony of Mr. Todd Lee. *Id.* at 5. Defendant alleges that plaintiff defaulted on her contract under Clause B–69(a) of the USPS Interim Internal Purchasing Guidelines, incorporated into the 2005 Contract by section 2.3.1.s(8) of the HCR Terms and Conditions. *Id.* at 16; see JX 2 at 128. According to defendant, plaintiff failed " 'to perform service according to the terms of the contract,' insofar as she did not 'perform box delivery services to the customers an[d] all other related services as outlined in Section B.3 ... or as directed by the contracting officer or authorized representative.' " Def.'s Br. 16 (quoting Clause B–69(a) and JX 2 at 91) (omission in original). Defendant also alleges that plaintiff violated section B.3.j.1.a of the 2005 Contract, which states that the contractor shall " '[d]eposit all mail matter received for that purpose from a post office into the appropriate customer mail boxes[.]' "

*Id.* (quoting JX 2 at 95) (alterations in original). Plaintiff argues that she did not "bring any undeliverable mail back to the post office." Pl.'s Br. 2.

According to defendant, "Defendant's witnesses and documentary evidence paint a consistent picture of the events of July 2, 2005, whereas the plaintiff's version of events has shifted from outright denials of culpability to qualified denials and even to admissions." Def.'s Br. 2–3. Defendant states that Mr. Lee's "narrative is corroborated at numerous steps along the way by the testimony of percipient witnesses and by the paper trail that [Mr. Lee] assiduously created at each stage." *Id.* at 5. The court notes that Mr. Lee created a paper trail, see DX 6; DX 7; DX 8, and that his testimony at trial was substantially consistent with his. previously written memoranda, see Tr. 90:2–127:16 (Mr. Lee), but his testimony was not corroborated by all of the witnesses at trial, see *id.* at 227:17–241:21 (Mr. Bryant). In particular, the contract carrier who was hired to replace plaintiff testified to several facts that sharply contradicted Mr. Lee's testimony. See, e.g., *id.* at 227:17–241:21 (Mr. Bryant) (testimony of Mr. Bryant that certain addresses on Mr. Lee's list of addresses to which Mr. Lee testified that he delivered mail undelivered by plaintiff on July 2, 2005, do not contain mail receptacles). Mr. Bryant's testimony is discussed in more detail below.

Mr. Lee's testimony that on July 2, 2005 he had received a phone call from Ms. Fox that plaintiff had returned to the Post Office with " 'quite a bit of mail,' " *id.* at 100:17–20 (Mr. Lee), was not "unequivocally corroborated by the testimony of Ms. Fox" as defendant claims, see Def.'s Br. 6. Ms. Fox's testi-

---

10. Mr. Lee testified, on direct examination by defendant's counsel, that the tub left on his desk on July 2, 2005 could not have contained mail brought to the post office by the 2:00 p.m. truck because Ms. Fox called him and informed him about the mail at approximately 1:40 p.m., before the 2:00 p.m. truck arrived, and because the 2:00 p.m. truck does not contain preferential or first class mail. Tr. 118:25–119:6 (Mr. Lee). Preferential mail is "mail that has a shorter committed delivery time." *Id.* at 87:1–5 (Mr. Lee). It is "committed for delivery that day." *Id.* at 117:2–3 (Mr. Lee). When asked if it would "have been possible for the mail in the tub that

Ms. Fox put on [Mr. Lee's] desk to have been collection mail from [plaintiffs] route," *id.* at 120:5–7 (Mr. Lee), Mr. Lee answered no, *id.* at 120:8 (Mr. Lee). According to Mr. Lee, the mail in the tub on July 2, 2005 had stamp cancellation markings and collection mail would not have contained such markings. *Id.* at 120:10–18, 121:7–17 (Mr. Lee); see DX 10–F, 10–G. Mr. Lee also stated that "some of the mail was the bulk rate advertising mail that didn't even originate in Pawleys Island" and that he thought that you could make out that one of the letters was from "like a government agency, not located in Pawleys Island." Tr. 120:19–23 (Mr. Lee).

mony stated: "I don't recall exactly what I said to [Mr. Lee] when I called him back. I think I just told him that there was a tub of mail on [plaintiff's] case that had mail in it. I don't recall saying an amount, no." Tr. 44:7–10 (Ms. Fox). Defendant also asserts that Mr. Lee's hand-written list of addresses to which deliverable mail was not delivered was corroborated by Mr. Kirchner's and Ms. Fox's observations of addresses when they witnessed mail on the conference room table. Def.'s Br. 7. Ms. Fox testified that in her observation of the mail on the conference room table she saw one address for Ocean Highway and another for Salt Marsh Cove. Tr. 29:16–18 (Ms. Fox). She also stated that she "did not witness exactly what individual addresses they were." *Id.* at 29:18–19 (Ms. Fox). Ms. Fox further stated that three different carriers deliver mail to Ocean Highway. *Id.* at 49:10–12 (Ms. Fox). Mr. Kirchner testified that he noticed that one of the pieces of mail had an address for Salt Marsh Circle. *Id.* at 63:5–6 (Mr. Kirchner). Ms. Fox's and Mr. Kirchner's observations of two addresses, neither with a house or box number, and one on a street to which three carriers deliver, does not fully corroborate Mr. Lee's hand-written list of addresses.

Defendant asserts that Mr. Lee's successful delivery of the allegedly undelivered mail "is corroborated in part by Mr. Lee's claim for reimbursement for using his personal vehicle to perform official business." Def.'s Br. 7 (citing DX 11, DX 12 and Tr. 130:24–134:22 (Mr. Lee)). While Mr. Lee's later claim for reimbursement is consistent with his testimony that he delivered undelivered but deliverable mail brought back to the Post Office by plaintiff on July 2, 2005, the reimbursement claim is not conclusive evidence of defendant's justification for its termination for default: that plaintiff returned to the Post Office with undelivered but deliverable mail. *See Lisbon,* 828 F.2d at 765 (holding that the burden is on the government to prove by a preponderance of the evidence that a termination for default is justified).

Defendant argued in briefing that "plaintiff's version of events has shifted from outright denials of culpability to qualified denials and even to admissions." Def.'s Br. 3.

Defendant relies on statements made by plaintiff: (1) that she did not bring back any mail to the Post Office except for collection mail, *see, e.g.,* Tr. 300:8–12 (Ms. Pinckney) ("Q: So your testimony today is that the only mail you brought back to the post office on July 2nd was collection mail? A: Yes, Sir, and I'm almost certain of that, Mr. Kiely."); and (2) that she may have brought back undeliverable mail, JX 4; Tr. 296:3–311:15 (Ms. Pinckney). Plaintiff's response to the Show Cause Notice states: "I DID NOT SKIP ANY MAILBOX THAT I COULD DELIVER TO." JX 4. According to defendant, this response suggests that plaintiff returned to the Post Office with undeliverable mail. Def.'s Br. 7.

Defendant argues that the errata sheet, dated November 8, 2007, amending plaintiff's answers to her deposition testimony, given on October 11, 2007, reiterates the position that plaintiff returned to the Post Office with undeliverable mail. *Id.* at 8. Portions of plaintiff's deposition testimony were read into the record at trial:

> The question was, "Did you bring mail back to the office that was in your view undeliverable?" Answer, "Not as I can remember, no, sir." Question, "So you brought no undeliverable mail back?" Answer, "No, sir, absolutely not."

Tr. 304:15–19 (Ms. Pinckney). When she filled out her errata sheet plaintiff changed her answer from " 'No, Sir, absolutely not,' to 'other than box blocked mail.' " *Id.* at 305:12–14 (Ms. Pinckney). Plaintiff argued at trial that she changed her answer to say that if she brought back mail it was only mail that was box blocked, not that she brought back mail that was box blocked. *Id.* at 305:22–23 (Ms. Pinckney); *see also id.* at 301:1–20 (Ms. Pinckney) (explaining that plaintiff was "almost certain" that she did not bring back any mail, but that if she had, it would have been mail that was undeliverable). Defendant's counsel then asked plaintiff to point to where the word "if" appears on the errata sheet. *Id.* at 305:24 (Ms. Pinckney). Plaintiff testified that the errata sheet contains a plus symbol followed by the phrase "other than box-blocked." *Id.* at 307:6–13 (Ms. Pinckney). When asked how

she would incorporate the change on the errata sheet into the text of her original answer during the deposition, plaintiff stated:

> Well, when I did that I really felt that I was going to be framed again. You know, I was discharged from my job based on lies. What I told myself and the fact that you just can't remember if, just if there may be a piece of mail but I'm almost certain I did not bring any back.

*Id.* at 308:8–13 (Ms. Pinckney). Defendant's counsel attempts to discredit plaintiff by drawing the court's attention to a possible discrepancy in plaintiff's recollection of the events of July 2, 2005. In the court's view, however, plaintiff merely amended her answers to account for the possibility that, given the passage of time, she had forgotten that she returned to the Post Office with mail that she was unable to deliver because one or more boxes were blocked. Although plaintiff did not remember completely the specific events of July 2, 2005, plaintiff testified to her typical practice of mail delivery, *id.* at 296:16–301:20 (Ms. Pinckney), and testified that she would never have returned to the Post Office with undelivered but deliverable mail, *id.* at 301:11–20 (Ms. Pinckney). Plaintiff also testified that she made amendments to her deposition testimony to protect herself from the possible manipulation of events by the Postmaster. *Id.* at 300:22–301:6 (Ms. Pinckney). Plaintiff explained:

> Q: And you amended [your answers to your deposition]. Can you tell the Court how you amended it?
>
> A: Well, for every question you asked, did you bring back, I'm almost certain I know I didn't bring any back, but I know how devious and manipulative our postmaster is, in all due respect, but I have been in there working with him. He did not want to give me a chance. He wanted me fired for something I did not do. I was in the Postal Service 18 years and he sat up on the stand here and I mean lied after lied.

*Id.* at 300:22–301:6 (Ms. Pinckney). The court does not consider plaintiff's amendments to have changed her testimony "from outright denials of culpability to qualified denials and even to admissions." *See* Def.'s Br. 3.

Mr. Bryant took over plaintiff's route after plaintiff's termination. Tr. 226:17–18 (Mr. Bryant). The addresses contained in JX 6 "are addresses [Mr. Bryant] currently deliver[s] mail to." *Id.* at 227:15–16 (Bryant). Both plaintiff's and Mr. Bryant's testimony support plaintiff's position that she delivered all deliverable mail on July 2, 2005, and that Mr. Lee could not have delivered to all of the addresses listed on JX 6 as Mr. Lee claims. Mr. Bryant was a credible witness with absolutely no perceptible bias in connection with this dispute. As the successor to Ms. Pinckney's postal route, he is fully acquainted with the postal route. Defendant argues that Mr. Lee's testimony "was amply corroborated by other witnesses," Def.'s Br. 9, yet defendant failed to address Mr. Bryant's testimony at all in its post-trial briefing. *See* Def.'s Br. *passim*; Def.'s Resp. *passim*.

One of the addresses on the Postmaster's list of undelivered mail is 321 Myrtle Avenue. JX 6; Tr. 265:3 (Ms. Pinckney). According to plaintiff, that address is the City Hall and plaintiff did not recall delivering to City Hall on July 2, 2005. Tr. 265:5–16 (Ms. Pinckney). Plaintiff did testify, however, that if City Hall got mail, it was delivered. *Id.* at 265:16–17 (Ms. Pinckney). Another address on the Postmaster's list of undelivered mail is 276B Atlantic Avenue. JX 6; Tr. 265:24 (Ms. Pinckney). Plaintiff testified that this box was blocked on July 2, 2005. Tr. 265:25–266:3 (Ms. Pinckney). According to plaintiff, if the box for 276B Atlantic Avenue was blocked, she would have brought the mail to the house because she knew the occupant fairly well. *Id.* at 266:8–16 (Ms. Pinckney). With respect to 158 Atlantic Avenue, plaintiff stated: "The lady that owned that house, she moved away and was trying to sell it, as I could remember, and there was hardly any mail that came." *Id.* at 268:17–20 (Ms. Pinckney). Plaintiff had no specific recollection of delivering mail to 174 Haunted Trail on July 2, 2005, *id.* at 269:13–23 (Ms Pinckney), but she did testify that sometimes, if the box was blocked, she took the mail to the house, *id.* at 269:14–16 (Ms. Pinckney). Plaintiff stated that, with respect to 12047

Ocean Highway, "[i]f they had mail that day, [she] delivered it." *Id.* at 270:17–24 (Ms. Pinckney). Plaintiff stated that 11388 Ocean Highway was a new business, *id.* at 271:12–13 (Ms. Pinckney), and that there would be no reason she could not deliver the mail to that address, *id.* at 271:14–16 (Ms. Pinckney).

According to plaintiff, there is no mailbox at 66 Lachicotte Drive [11] and there has been no mailbox for the eighteen years plaintiff has been delivering the mail. *Id.* at 271:23–272:1 (Ms. Pinckney). Plaintiff also stated that 631 Springs Avenue, another address on the Postmaster's list of undelivered addresses, does not have a mailbox. *Id.* at 269:3–9 (Ms. Pinckney).

Mr. Bryant testified that when he took over plaintiff's route, he did not deliver mail to 66 Lachicotte Drive, *id.* at 227:17–228:4 (Mr. Bryant) (stating that there has not been a mail receptacle at 66 Lachicotte Drive since he took over the route), or 631 Springs Avenue, *id.* at 228:21–22 (Mr. Bryant) (stating that there has not been a mail receptacle at 631 Springs Avenue since he took over the route). Mr. Bryant testified that if he received mail for 631 Springs Avenue and there was no mailbox there, he would return the mail to the Post Office as " 'No mail receptacle.' " *Id.* at 235:11–21 (Mr. Bryant). After further pressing by defendant's counsel, Mr. Bryant maintained that if there was no mail receptacle he would not even deliver the mail if people were in the house and the door was open. *Id.* at 235:22–236:3 (Mr. Bryant) ("No, sir, because at the office it would be indicated—to me it would be known that there was not a mail receptacle so I wouldn't have any reason for it to leave the office.").

Mr. Lee testified that he delivered mail to 631 Springs Avenue and 66 Lachicotte Drive on July 2, 2005. *Id.* at 158:9–17, 159:25–160:1 (Mr. Lee). Mr. Bryant testified that there is not even an address slot on the sorting case for 631 Springs Avenue or for 66 Lachicotte Drive. *Id.* at 241:3–5, 9–11 (Mr. Bryant). Mr. Lee, however, testified that he was able to find slots on the sorting case for all of the

allegedly undelivered mail. *Id.* at 142:17–23 (Mr. Lee).

Plaintiff testified that 10554 Ocean Highway is the beachwear shop and that there would be no reason for her not to have delivered mail to that address. *Id.* at 272:2–4 (Ms. Pinckney). Plaintiff testified that 428 Sundial hardly receives any mail, and that there has "never been an occasion for a blocked box or for [her] not to deliver their mail." *Id.* at 272:5–9 (Ms. Pinckney). According to plaintiff, the resident located at 540 Norris also "hardly gets any mail," *id.* at 272:12–14 (Ms. Pinckney), but she would have delivered any mail addressed to 540 Norris, *id.* at 272:15–16 (Ms. Pinckney). With respect to 10570 Ocean Highway, plaintiff could not remember the business name, but testified that "it looks to be an address that there wouldn't be no reason for [her] not to deliver their mail, if they had gotten mail." *Id.* at 272:17–21 (Ms. Pinckney). As for the three addresses on Sportsman Drive, plaintiff stated that "[i]f they had mail, it got delivered, because their box is hardly—I have never had a problem with these addresses." *Id.* at 273:12–14 (Ms. Pinckney). Plaintiff testified that she has never had a problem delivering to any of the houses on Brown Pelican Loop. *Id.* at 274:4–6 (Ms. Pinckney). Plaintiff testified that one resident on Brown Pelican Loop has some kind of an attack dog, but that resident informed plaintiff that she could blow her horn and he would come out and get the mail. *Id.* at 274:5–13 (Ms. Pinckney). The address of 218 Salt Marsh Drive is a condo. *Id.* at 274:15–18 (Ms. Pinckney). Plaintiff testified that there are about 156 units in the building. *Id.* at 275:2 (Ms. Pinckney). According to plaintiff, "there would have been no reason for [her] not to deliver this man's mail, when [she had] over 100 right in the same cluster box." *Id.* at 275:7–9 (Ms. Pinckney).

Mr. Bryant testified that 10744 A Ocean Highway and 10744 B Ocean Highway are grouped together in one box and "became active after [he] acquired the route." *Id.* at 229:5–8 (Mr. Bryant). "When I originally

---

11. Plaintiff refers to "66 Lachicotte." Tr. 271:25 (Ms. Pinckney). Mr. Bryant refers to "66 Lachicotte Lane." *Id.* at 227:24. The court understands these references to be to 66 Lachicotte Drive. *See* JX 6; JX 2 at 89; Defense Exhibit (DX) 15.

started the route, they didn't receive mail at that box." *Id.* at 237:10–12 (Mr. Bryant). Mr. Lee testified, however, that he delivered mail to 10744 B Ocean Highway on July 2, 2005. at 160:6–14 (Mr. Lee). Mr. Bryant further testified that 10744 H Ocean Highway is now "vacant," but that he was not sure about their activity at the time he took over the route. *Id.* at 229:8–13 (Mr. Bryant). Mr. Bryant stated: "I want to say that [10744 H] wasn't active but there's an H and there's an H–1, and I'm not sure as to which business that is.... I want to say they were inactive. I mean, that's just my best judgment right now." *Id.* at 237:17–238:10 (Mr. Bryant). Mr. Bryant also testified that there is also only one slot for both 10744 A and 10744 B Ocean Highway. *Id.* at 241:16–21 (Mr. Bryant). According to Mr. Bryant, seven to ten businesses do not receive mail on Saturdays. *Id.* at 230:12–18 (Mr. Bryant). Mr. Bryant testified that the mail for addresses with no Saturday delivery is cased and left in the tub and notification is made that the mail is no Saturday delivery mail. *Id.* at 230:19–231:12 (Mr. Bryant).

Mr. Bryant's testimony not only does not corroborate Mr. Lee's testimony, Mr. Bryant's testimony squarely contradicts Mr. Lee's testimony with respect to at least four addresses: 66 Lachicotte Drive, *see* Tr. 227:17–228:4 (Mr. Bryant), 631 Springs Avenue, *see id.* at 228:21–22 (Mr. Bryant), 10744 A Ocean Highway, and 10744 B Ocean Highway, *see id.* at 237:10–12 (Mr. Bryant).

Mr. Harris' mistake concerning whether the twenty-five addresses were in fact in the beach area further detracts from the consistency of defendant's argument.[12] Plaintiff notes that DX 5 contains only twenty-two individual addresses. Pl.'s Resp. 4. JX 6 also contains only twenty-two individual addresses. *See* JX 6. The photograph of the piles of

mail on the conference table contains at most twenty individual piles. *See* DX 10A.

Plaintiff argues that the only mail that could have been in the tub that Ms. Fox brought into Mr. Lee's Office was hold mail. Pl.'s Resp. 3; Tr. 279:15–280:4–8 (Ms. Pinckney). As defendant points out, Def.'s Br. 8, plaintiff did not make this argument in her response to the Show Cause Notice, *see* JX 4, and the addresses on Mr. Lee's list of undelivered mail, JX 6, are different both from plaintiff's and from Mr. Lee's list of addresses of mail being "held" on July 2, 2005, *see* Tr. 281:9–282:16 (Ms. Pinckney); DX 5. Plaintiff's argument is not entirely inconsistent with these facts. Plaintiff did not say there was definitely hold mail in the tub, only that if there was mail in the tub it would have been hold mail.

Plaintiff's response to the Show Cause Notice was not "dismissive," as defendant suggests. *See* Def.'s Br. 17. The Show Cause Notice stated that plaintiff "returned to the office with mail for approximately 25 houses for Ocean Highway (not the beach area) and went home early." JX 3. Knowing that there are not twenty-five houses to which plaintiff delivers on Ocean Highway, and knowing that she did not have trouble delivering to any addresses that were not on the beach, *see* Pl.'s Resp. 3 ("These residents have never received fifty-three pieces of mail in a week. There was no witness/nor testimony of me skipping twenty-five (25) houses on Ocean Highway. There were no witness/nor testimony of me returning with any mail."), plaintiff responded that these were "false statements" and that she was "unjustly accused," JX 4. Plaintiff articulated her defense as an outright denial of the Postmaster's accusations. *Id.* It might not have been the explanation the contracting officer was expecting, but it did address the issue. The

---

12. Defendant contends that "the [c]ourt ruled against plaintiff on th[e] issue [of the number of residences on Ocean Highway] earlier in the case." Defendant's Post–Trial Reply Brief (defendant's Response or Def.'s Resp.) 2 (citing *Pinckney v. United States (Pickney I)*, 81 Fed.Cl. 207 (2008)). This is not an accurate statement of the court's Opinion. The court stated: "As defendant states: 'The facts that the [Show Cause Notice] incorrectly stated 25 addresses were not in the beach area, when nine addresses were in

that area, did not vitiate the [Show Cause Notice] and did not deny Ms. Pinckney an adequate opportunity to respond to the allegations.'" *Pinckney I*, 81 Fed.Cl. at 217 (alterations in original) (citation omitted). The court found that plaintiff's allegation did not eliminate the existence of a genuine issue of material fact and denied summary judgment for plaintiff. *Id.* at 218. The court made no specific ruling regarding the issue of the number of addresses on Ocean Highway. *See id.* at 217–18.

Show Cause Notice also made reference to a letter plaintiff received on September 10, 2004, warning plaintiff that she must restore satisfactory service to her route and maintain it. JX 3. Plaintiff was therefore reasonable in stating:

> The only instance that would warrant the mail not being delivered is the following:
>
> MAIL BOX BLOCKED
>
> STREET/ROAD UNACCESSIBLE DUE TO CONSTRUCTION
>
> MAIL BOX IS DOWN

JX 4.

The termination letter stated that plaintiff's response "did not adequately address the issue of non-delivered deliverable mail." JX 5. An outright denial of the allegations contained in the Show Cause Notice clearly addresses the issue. Section 2.3.1.m of the 2005 Contract states that the USPS "may terminate this contract, or any part hereof, for default by the supplier, or if the supplier fails to provide the Postal Service, upon request, with adequate assurances of future performance." JX 2 at 127. The court finds plaintiff's denial of any wrongdoing to be an adequate response to the Show Cause Notice. Defendant argues that plaintiff's categorical denial did not provide the contracting officer with adequate assurance that "plaintiff would mend her errant ways and be a conscientious contractor." Def.'s Br. 17. But the primary question is whether the contracting officer had sufficient evidence to find that plaintiff's performance was "errant" in the first place. Furthermore, plaintiff's statements—"The only instance that would warrant the mail not being delivered is the following: MAIL BOX BLOCKED[,] STREET/ROAD UNACCESSIBLE DUE TO CONSTRUCTION[, and] MAIL BOX IS DOWN" and "I DON'T PLAY GAMES WITH THE MAIL, I TAKE PRIDE IN MY WORK. I LOVE DELIVERING THE U.S. MAIL."—provide assurances of future performances. JX 4.

Mr. Harris testified as to why he felt it was necessary to terminate plaintiff's contract for default:

> I didn't feel that I could control delivery of mail. We had had issues before with Ms. Pinckney and her not being able to deliver and bringing mail back to the office. We had done something that was unusual, this call to the postmaster, and still were not able to get mail delivered, and the other things is from her show cause response, she didn't even really in my—she didn't in my estimation address the non-delivery of the mail on July the 2nd.
>
> So at that point, I mean, the only reason we have a box delivery route is to deliver mail. So since I couldn't depend on this route to deliver the mail that was deliverable that day, I really was out of options. I mean, I couldn't—I couldn't put in a backup route to overlay it. That wouldn't have made sense and cost the Postal Service a lot more money. Couldn't control the delivery any more, couldn't rely on the delivery any more. So that's why I had to terminate.

Tr. 193:16–194:9 (Mr. Harris). After hearing this testimony the court stated: "The Court issued the order that stated that matters in prior contracts could not be argued ... in support of termination of this contract, and that was the ruling, and the Court intends to disregard any testimony that relates or appears to relate to contracts in the period prior to July 1." Id. at 202:15–22. Mr. Harris' testimony, elicited by defendant in direct examination notwithstanding the court's prior ruling [13], makes clear that defendant's decision to terminate was based, at least in part, on Mr. Harris' perception of Ms. Pinckney's performance of a prior contract.

Mr. Harris stated that he "would be most disappointed to learn" that some of the twenty-five addresses provided to him by Mr. Lee do not even have mailboxes. Id. at 209:23–210:1 (Mr. Harris). But he also stated that plaintiff never raised the issue of whether

---

**13.** As discussed above, *see supra* Part I, the court held, in an Opinion issued on January 14, 2009, that it would "not receive testimony or exhibits at trial to the extent such testimony or exhibits relate to contracts in force prior to the contract at issue in this dispute," *Pinckney v. United States (Pinckney III)*, 85 Fed.Cl. 392, 397 (2009).

"there were mailboxes for certain addresses which had not been delivered on July 2nd, 2005." *Id.* at 215:16–20 (Mr. Harris). With respect to the Show Cause Notice, Mr. Harris stated:

> The aim of the show cause letter is to give the supplier in this case a chance to explain their position, so the description in the show cause letter only needs to be accurate enough to refer to the events of that day. Once we know what day we're talking about, we know what incident we're talking about, that opens it up to the supplier to be able to explain their position.

*Id.* at 215:8–15 (Mr. Harris). Plaintiff categorically denied the accusations made against her in the Show Cause Notice. JX 4. Plaintiff's categorical denial was sufficient to put Mr. Harris on notice that there was an issue over whether the events of July 2, 2005, as alleged by Mr. Lee, actually occurred. A further investigation, or interview with plaintiff, could have provided a more accurate description of events.

The court does not find that the decision of the contracting officer was based on "solid evidence" as defendant asserts. *See* Def.'s Br. 17 (internal quotations omitted). Plaintiff argues that the contracting officer "failed to investigate and verify" the evidence provided to him by Mr. Lee, in particular, the list of addresses and the photographs of allegedly undelivered mail. Pl.'s Resp. 2. The discrepancies concerning the number of individual addresses to which mail was allegedly not delivered, *see* DX 5, JX 6, DX 10A, JX 3, Tr. 185:11–14 (Mr. Harris), and the fact that Mr. Bryant testified that certain addresses on Mr. Lee's list of addresses to which mail was not delivered had no mail receptacles and did not receive mail, Tr. 227:17–237:12 (Mr. Bryant), and that there were no address slots on the sorting case for certain other addresses on Mr. Lee's list, *id.* at 241:3–5, 9–11 (Mr. Bryant), are of concern to the court. Furthermore, the photographs marked as DX 10A–L do not contain identifiable addresses. *See* DX 10A–L.

Defendant asserts that "for the [c]ourt to uphold plaintiff's self-serving version of events on July 2, 2005, it must disregard Mr. Lee's recollection of events, which is amply supported by contemporaneous documentary evidence and the testimony of two witnesses, in favor of the ever[-]shifting testimony of the plaintiff." Def.'s Resp. 2–3. The court disagrees with defendant's assessment. The "contemporaneous documentary evidence" to which defendant refers is evidence written and created by Mr. Lee. *See* DX 5; DX 7; DX 8; DX 10A–L; DX 11; JX 6. While it does show that Mr. Lee's testimony has been consistent, it does not follow that Mr. Lee's testimony is truthful. Furthermore, the two witnesses to which defendant refers, Ms. Fox and Mr. Kirchner, do not unequivocally support the entirety of Mr. Lee's testimony, and do not support Mr. Lee's most important contentions at all. Ms. Fox specifically stated that she did not remember stating there was "quite a bit of mail." Tr. 44:4–10 (Ms. Fox). Ms. Fox and Mr. Kirchner observed piles of mail on the conference room table, *id.* at 29:12–19 (Ms. Fox), 62:16–63:11 (Mr. Kirchner), but Ms. Fox could only remember seeing one address for Ocean Highway and one for Salt Marsh Cove, *id.* at 29:12–19 (Ms. Fox), and Mr. Kirchner could only remember seeing one address for Salt Marsh Circle, *id.* at 63:4–6 (Mr. Kirchner), not any specific addresses, *id.* at 29:12–19 (Ms. Fox), 63:4–6 (Mr. Kirchner). Neither saw Mr. Lee leave the Post Office with mail to deliver on July 2, 2005. *Id.* at 37:14–16 (Ms. Fox), 74:4–10 (Mr. Kirchner).

Most significantly, defendant fails entirely to account for the testimony of Mr. Bryant, who testified that certain addresses to which Mr. Lee claims he delivered mail do not possess mail receptacles. *Id.* at 227:17–238:10 (Mr. Bryant). For the court to uphold plaintiff's version of the events of July 2, 2005, it must find that defendant has not justified plaintiff's termination for default by a preponderance of the evidence. *See Lisbon*, 828 F.2d at 765. The court must find that the preponderance of the evidence does not favor Mr. Lee's recollection of events, supported by his own documentary evidence and partially supported by the testimony of two witness, over plaintiff's recollection of events, partially supported by the testimony of three witnesses. In evaluating the conflicting versions of events given by Ms.

Pinckney and Mr. Lee, the court is assisted by the testimony of Mr. Bryant, which the court finds highly credible.

Defendant contends that the government has a right to strict performance of the contract and that plaintiff's alleged failure to complete delivery of the mail on July 2, 2005 justified her termination for default. Def.'s Br. 4 (citing, *inter alia, In re Greene*, 07–1 BCA ¶ 33,471, PSBCA Nos. 5093, 5215, 2007 WL 172111 (Jan. 12, 2007), *recons. denied*, PSBCA Nos. 5093, 5215, 2007 WL 5442324 (June 11, 2007) and *In re Road Service, Inc. (Road Service)*, 83–1 BCA ¶ 16,218, PSBCA No. 1023, 1982 WL 7294 (Dec. 30, 1982)). The Postal Service Board of Contract Appeals (PSBCA) has stated: " 'The need for delivery of the mails necessitates a strong control over performance by the Postal Service.' " *Road Service*, 83–1 BCA ¶ 16,218 at 80,587 (citation omitted). The cases cited by defendant, however, differ in significant ways from the case before this court, namely, in the fact that they involve terminated contractors with the USPS who argued that their nonperformance was excusable, and not a contractor, like Ms. Pinckney, who disputes, with evidentiary support, the underlying factual basis for the termination. *See In re Greene*, 07–1 BCA ¶ 33,471 at 165,928; *Road Service*, 83–1 BCA ¶ 16,218 at 80,587–88. Defendant also cites to *McDonnell Douglas I* for the proposition that "[a] clear violation of contract terms by the contractor supports a finding that a reasonable, contract-related basis for the termination exists." Def.'s Br. 16 (citing *McDonnell Douglas I*, 182 F.3d at 1328). However, there is not a clear violation of the contract terms in this case; the issue of whether plaintiff delivered all deliverable mail on July 2, 2005 is contested in the evidence. *See Pinckney I*, 81 Fed.Cl. at 218.

In *Road Service*, evidence of the route irregularities of the employee terminated by the USPS for default were recorded on Form 5500s. *Road Service*, 83–1 BCA ¶ 16,218 at 80,586. The terminated employee failed to return the Form 5500s or to provide adequate explanations for the reported irregularities. *Id.* Importantly, in *Road Service*, the existence of the nonperformance was not at issue, rather the issue centered on wheth-

er the nonperformance was excusable. *Id.* at 80,587. While the employee blamed his nonperformance on the weather, the evidence showed that federal workers reported to work that day and that commercial travel was operating as well. *Id.* at 80,587–88. Likewise, in *In re Greene*, there was no dispute as to whether the terminated employee had taken the actions underlying his termination, specifically, omitting trips and combining the mail for more than one trip on one truck. *In re Greene*, 07–1 BCA ¶ 33,471 at 165,923–27. Rather, the dispute focused on whether the employee's actions were permitted. *Id.* at 165,928. The PSBCA found that the USPS "is entitled to strict performance of its contract requirements" and that the termination was justified. *Id.* A decision by the PSBCA in 2008 also upheld the default termination of a mail delivery contract carrier. *In re Malone*, 08–2 BCA ¶ 33,958, PSBCA No. 6129, 2008 WL 4065837 (Sept. 2, 2008). In *In re Malone*, the contract employee was terminated "because he refused to deliver mail to part of his route along a road he considered unsafe." *Id.* at 167,998. The PSBCA determined that the road was not unsafe and that his nonperformance was not excused. *Id.* at 168,002–03. These cases differ from the case before this court because, here, plaintiff states that she delivered all deliverable mail. Pl.'s Resp. 9. This is not a case where plaintiff admits to non-delivery and argues that the non-delivery was excused. The USPS has not proved, by a preponderance of the credible evidence, that plaintiff defaulted in her performance of her contract. The court finds that the USPS improperly terminated plaintiff's contract for default.

### B. Whether the Government Acted in Bad Faith

In *Keeter Trading Co. v. United States, (Keeter II)*, the Court of Federal Claims found that the USPS improperly terminated the plaintiff's contract for default and acted in bad faith. *Keeter II*, 85 Fed.Cl. 613, 614 (2009). The USPS terminated the mail delivery contract held by Keeter, Inc. (KI) after KI refused to service fifty-two additional mailboxes added to KI's route by a Route Service Order unilaterally issued by the con-

tracting officer. *Id.* at 615. KI alleged that the postmaster "engaged in tactics designed to intimidate plaintiff into compliance with this unilateral change." *Id.* at 616. The court found that, although the postmaster did not authorize the termination of KI's contract, "it was [the postmaster's] representations and recommendations which set in motion the Postal Service's actions depriving KI of its contractual rights and resulting in the wrongful default termination of the contractor." *Id.* at 619. The court also found that the contracting officials "relied almost exclusively on the [postmaster] to make its final decision regarding plaintiff's default termination" and that "[i]n collaborating with the [postmaster], and failing to exercise an independent and informed judgment, the contracting officials violated the government's duty of good faith performance, and thus acted in bad faith in the administration of the contract at issue." *Id.* at 625. In finding bad faith, the court in *Keeter II* relied on *Struck Constr. Co. v. United States (Struck)*, a 1942 case decided by the United States Court of Claims. *Id.* The *Struck* court stated:

> If the aggregate of the actions of all the agents would, if done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard. It is the responsibility of the entity, the principal, to so coordinate the work of its agents that the aggregate of their actions will conform to required legal standards.

*Struck,* 96 Ct.Cl. 186, 221 (1942).

Defendant argues that "there is absolutely no credible evidence of subjective bad faith on the part of any Postal Service official." Def.'s Br. 18. Plaintiff, on the other hand, alleges bad faith: "And they were trying to fire me, and most of it was politically motivated, because one day there is no way you could give me an upbeat evaluation and the following week here you're hoping for me to be terminated without even understanding what the crisis or addressing what it is that is really alarming me." Tr. 248:16–22 (Ms. Pinckney). Plaintiff testified that she had trouble delivering to certain addresses on her route due to blocked boxes and that when

she informed Postmaster Lee of the situation he did not stand up for her or take action to improve the situation. *Id.* at 246:14–248:14 (Ms. Pinckney). According to plaintiff, Postmaster Lee "looked at [her] as being paranoid or less than ignorant." *Id.* at 247:9–10 (Ms. Pinckney). Plaintiff stated: "I would approach certain boxes, and it was always in the same area, most of the time. And I made this fact known to postal officials and there were some concerns, citizens on the route, you know, that advised me—one told me, said Wonderlyn, you're working with a Judas, and at the time I didn't know what they meant, but now I know." *Id.* at 247:20–248:2 (Ms. Pinckney).

■■■ The standard for proving bad faith is high. *See Keeter I*, 79 Fed.Cl. at 252 (acknowledging that agents of the government are presumed to "discharge their duties in good faith" and stating that "[t]o rebut that presumption and to establish that the government indeed terminated a contract in bad faith requires 'irrefragable proof' " (citation omitted)). Plaintiff must provide "clear and convincing" evidence of improper motive on the part of the government because "showing a government official acted in bad faith is intended to be very difficult." *See Am–Pro*, 281 F.3d at 1239–40. The termination for default was issued by Mr. Harris, JX 5, but Mr. Lee's actions are relevant to the bad faith determination as well. *See Struck,* 96 Ct.Cl. at 221. Although the contracting officer testified that he weighed the decision to terminate plaintiff carefully, Tr. 189:24–194:9 (Mr. Harris), he based his decision on photographs containing unidentifiable mail, DX 10A–L, and the allegations of Postmaster Todd Lee, *see, e.g.,* DX 7; DX 8. However, plaintiff's allegations of bad faith are not sufficiently supported in the evidence at trial to prove bad faith. *See Am–Pro*, 281 F.3d at 1239–40. While defendant has not proven by a preponderance of the evidence that plaintiff's termination for default was justified, plaintiff has not proven by clear and convincing evidence that either Mr. Harris or Mr. Lee acted in bad faith. *See id.* Although plaintiff testified to her concerns about the intent with which Mr. Lee acted, Tr. 247:20–248:23, 300:22–301:6, 308:8–13 (Ms. Pinckney), the evidence at trial did not

effectively serve to corroborate Ms. Pinckney's concerns. Plaintiff has not shown by clear and convincing evidence that either Mr. Harris or Mr. Lee acted with a specific intent to injure plaintiff or that the government's conduct was "designedly oppressive" or "initiated a conspiracy to get rid of [plaintiff]." *See Keeter I*, 79 Fed.Cl. at 263–64 (internal quotations omitted).

### C. Damages

 The court finds that the USPS improperly terminated plaintiff's contract for default. *See supra* Part IV.A. Plaintiff's termination for default is therefore converted to a termination for convenience. *See* JX 2 (2005 Contract) at 127. Plaintiff's 2005 Contract began on July 1, 2005 and had an end date of March 31, 2009, at an annual rate of $30,282.92. JX 2 at 84. The 2005 Contract was terminated effective August 9, 2005, JX 5, within the first two years of the contract term. Plaintiff's indemnity is therefore one-third of $30,282.92, or $10,094.31. *See* JX 2 at 130 (stating that "liquidated damages for the termination will be established as: (i) One-third of the annual rate (if during the first two years)"); *supra* Part II.D (discussing the relevant terms of the 2005 Contract).

### D. Defendant's Counterclaim

Defendant argues that it is entitled to recover reprocurement costs for the terminated contract in the amount of $1,720.74. Def.'s Br. 3, 18–19. Because the court finds that defendant improperly terminated plaintiff's contract for default, *see supra* Part IV.A, defendant cannot prevail on its counterclaim.

### V. Conclusion

For the foregoing reasons, the court finds that the USPS improperly terminated plaintiff's contract for default. Plaintiff's termination for default shall be converted to a termination for convenience. Accordingly, plaintiff shall be AWARDED DAMAGES in the amount of $10,094.31. The Clerk of Court is directed to ENTER JUDGMENT for plaintiff in the amount of $10,094.31, plus interest pursuant to 41 U.S.C. § 611 (2006). The Clerk of Court shall ENTER JUDG-MENT for plaintiff on defendant's counterclaim. Plaintiff shall be awarded her costs.

IT IS SO ORDERED.